LOUISE A. ELLIS and ROBERT B. ELLIS, Plaintiffs, v. ERNEST A. DI SABATINO and ERNEST DI SABATINO & SONS, INC., a Delaware corporation, Defendants.

(*January* 30, 1962.)

LYNCH, J., sitting.

*Robert C. O'Hora* and *John P. Daley* for Plaintiffs.

*F. Alton Tybout* (of Prickett, Prickett and Tybout) for Defendants.

Superior Court for New Castle County, No. 1589, Civil Action, 1960.

LYNCH, Judge.

Plaintiffs sued defendants to recover damages resulting from collision of two automobiles, one driven by Louise A. Ellis and the other driven by Ernest A. DiSabatino. The collision took place at the intersection of Bancroft Parkway and West Fourth Street in Wilmington. The accompanying sketch of the street intersections will help in understanding the facts.

Plaintiffs' complaint alleged the collision took place on November 12, 1959 at about 3:00 P.M. They charged Ernest DiSabatino was negligent in the operation of defendants' car as it was proceeding east on West Fourth Street.

Defendants' answer denied negligence on behalf of Mr. DiSabatino and set up contributory negligence, contending Mrs. Ellis "failed to remain at a stop in obedience to a stop sign, but proceeded across Fourth Street at a time when such movement could not be made in safety in violation of 21 *Del. C.*, § 4143(b)".

Mrs. Ellis testified on deposition. An affidavit was filed on behalf of the defendants, it having been made by the defendant, Ernest A. DiSabatino. Some comment will be made hereafter regarding this affidavit.

It was Mrs. Ellis' testimony that the weather was clear and the sun was shining at the time of the accident; that she was proceeding north on the east lane[1] of Bancroft Parkway toward its intersection with West Fourth Street, proceeding from a friend's apartment to her place of employment. West Fourth Street is approximately 50 feet wide at its intersection with Bancroft Parkway. The east lane, which carries north-bound traffic is 21 feet wide at its intersection with the south curb line of West Fourth Street. There is a stop sign at the intersection of the east lane of Bancroft Parkway and its intersection with West Fourth Street. There is a school on the South side of West Fourth Street, west of the west lane of Bancroft Parkway. As Mrs. Ellis drove north on the east lane of Bancroft Parkway a car was parked at the south curb of West Fourth Street in the area of the grass plot separating the west and east lanes of Bancroft Parkway. Mrs. Ellis testified that as she drove north on Bancroft Parkway her speed was about 5 to 10 miles per hour. She stopped her car at the crosswalk, at the south curb of West Fourth Street, at Bancroft Parkway, to let children, walking on West Fourth

---

[1]Bancroft Parkway has two lanes of traffic separated by a grass plot, approximately 91 feet 6 inches in width. The west lane of Bancroft Parkway carries southbound traffic; the east lane carries northbound traffic. West Fourth Street carries traffic in both directions. The sketch was prepared by the City Engineer from the records in his office.

Street in an easterly direction, cross in front of her. She stated (Dep. 18-19) that there was a large number of children and it was necessary for her to stop for about five minutes, after which she moved her car to the intersection of the south curb of West Fourth Street and the east curb of the east lane of Bancroft Parkway and stopped again. Having looked in both directions on West Fourth Street she entered the intersection and at that time saw no cars moving in either direction and when she looked to her left (Dep. 41). There was a taxicab parked at the south curb of West Fourth Street, in the grass plot which separates the east lane and west lane of Bancroft Parkway, and Mrs. Ellis admitted this could have blocked her view as she looked to her left in entering the intersection (Dep. 20 and 38). Mrs. Ellis further admitted that she may not have looked to her left (Dep. 20), as she pulled into the intersection and after the parked taxicab ceased to obstruct her view (Dep. 39); that she was concerned with children playing around the north curb of West Fourth Street in the area near the east lane of Bancroft Parkway, and she was watching these children as she drove into and through the intersection. At the time of the collision Mrs. Ellis was proceeding straight across West Fourth Street north on the east lane of Bancroft Parkway (Dep. 17), and the first time she saw the DiSabatino car was when she heard the sound of its brakes (Dep. 11); she thinks that the DiSabatino car was going "pretty fast"; she was unable to estimate its speed (Dep. 14). When she saw the DiSabatino car it was less than a few feet from the rear of her car (Dep. 14); and the front of the DiSabatino car struck the left rear wheel of the Ellis car (Dep. 15).

Mrs. Ellis testified that when she had seen Mr. DiSabatino's car (Dep. 14) it was going "pretty fast"; "he threw quite a bit of skid mark when it hit me". The force of the collision was sufficient to buckle up the inside of the trunk of the Ellis car (Dep. 5) when the DiSabatino car struck the Ellis car, Mrs. Ellis said (Dep. 15) she was only

going 5 miles per hour and she had almost cleared the intersection (Dep. 20) and the DiSabatino car (Dep. 14) was "less than a couple of feet away". It may be observed in passing that Mrs. Ellis' car has an overall length of 18 feet.

Mrs. Ellis further testified (Dep. 23) that Mr. DiSabatino told her at the scene of the collision that he felt the collision was his fault. He told Mrs. Ellis that he was on his way to an appointment at the Marine Terminal and was due there at 3:30 P.M.; thus, it appears that it would have been necessary for Mr. DiSabatino to have driven clear across the city to reach his point of destination.

An affidavit filed by Mr. DiSabatino states that his office was located about four blocks west of the intersection of West Fourth Street and Bancroft Parkway. He left from his office and he had driven east on West Fourth Street to the intersection where the collision occurred. He knew that traffic on all streets crossing West Fourth Street was controlled by either stop signs or traffic lights. As Mr. DiSabatino approached the west lane of Bancroft Parkway he was watching the children at play in the area; he stated that his view of traffic on the east lane of Bancroft Parkway was partially obscured by the taxicab parked along the south curb of West Fourth Street just west of the east lane of Bancroft Parkway. Mr. DiSabatino fixed the speed of his car at 20 miles an hour and he testified the Ellis car drove into the intersection, as he was proceeding on West Fourth Street, approaching the intersection with the east lane of Bancroft Parkway; he stated he applied his brakes but skidded into the rear of the Ellis car.

Defendants, it is to be noted, argue their contention of contributory negligence on Mrs. Ellis' part solely on 21 *Del. C.* § 4143(b), which section provides:

"§ 4143. Stop signs

"(a) Whenever a stop sign, notifying drivers to come to a full stop, has been erected by the proper State or local au-

thorities as provided in this title, it shall be unlawful for the driver of any vehicle to fail to stop in obedience thereto.

"(b) The operator of any vehicle who has come to a full stop as provided in subsection (a) of this section, shall not enter into, upon or across, such highway or street until such movement can be made in safety."

The Motor Vehicle Laws, Traffic Regulations and Rules for Driving, adopted by the Street and Sewer Department (now Department of Public Works), and applying to "all driving and vehicular traffic and coaches, as well as pedestrians, on the public streets of the City of Wilmington, Delaware," has a specific section, *viz.* Section 602—that applies to "Stop" signs—

"(a) Where any street is marked or signed by authority of the Street and Sewer Department at or near the property line of the intersecting street with markings or sign bearing the word 'Stop', the driver of a vehicle * * * approaching such 'Stop' sign shall bring such vehicle * * * to a full stop before entering onto or crossing the intersecting street, * * *.

"(b)   * * *.

"(c) The driver of a vehicle * * * who has stopped * * * as required by these Rules and Regulations * * * in obedience to a 'Stop' * * * sign at any intersection, shall yield to other vehicles * * * within the intersection or approaching so closely on the intersecting street as to constitute an immediate hazard, but said driver having so yielded may proceed, and other vehicles * * * approaching the intersection on the intersecting street shall yield to the vehicle * * * so proceeding onto or crossing the intersecting street."

Comparison of the foregoing will reveal that there is a difference between the State law and the traffic control regulations adopted by the City of Wilmington. The Court is called upon to decide whether the State Regulation or that

provided by the City authorities is controlling. Defendants urge the Court to follow the decision of President Judge Terry in *Rumble v. Lingo*, 1 *Storey* 417, 147 *A.* 2d 511 (Super. Ct. 1958) where, 1 *Storey* 419, 147 *A.* 2d 513, it was said:

"The language employed under Paragraphs (a) and (b) of Section 4143 of the Code aforesaid is free from ambiguity. It is clear and readily understandable. It means precisely what it says; that is, an operator of a motor vehicle in this State who in obedience to a stop sign has stopped at an intersection prior to traversing the same against a traffic flow is specifically charged under the provisions of Section 4143(b) aforesaid to refrain from negotiating the intersection until he can do so with safety, and this embraces placing the burden on said operator to maintain a continual vigilance and such control over his vehicle that he may avoid immediate hazards of approaching traffic while crossing the favored highway. The fact that a plaintiff operator does enter an intersection and is involved in a collision within the danger area thereof with a motor vehicle travelling in the favored traffic pattern raises a conclusive presumption of contributory negligence on his part * * *."

Defendants insist that this Court should follow an opinion by Judge Caleb R. Layton, III, *Prouse v. Burley*, 10 *Terry* 537, 121 *A.* 2d 291 (Super. Ct. 1956), in which decision Judge Layton ruled "that a City ordinance governing the operations of motor vehicles is invalid if in conflict to the State Statute". I concede that is the law generally, 62 *C. J. S.* Municipal Corporations § 143; *Boyer v. Delaware Liquor Comm.*, 6 *W. W. Harr.* 224, 173 *A.* 522 (Super. Ct. 1934), and were it not for the matters mentioned hereafter I would consider myself bound by Judge Layton's ruling.

Under the circumstances I cannot feel bound by *Prouse v. Burley*, much as I respect Judge Layton's ability and capability. It was held in *Mendolia v. Zakrzewski et al.*, 2 *Terry* 354, 361, 22 *A.* 2d 835 (Super. Ct. 1941) that this Court is

not always bound by a prior decision of this Court. In that case the late Chief Justice Layton ruled there was "error" in a prior ruling and he did not consider himself bound for that reason. Here, in the case under consideration, it appears from an examination of the briefs submitted in *Prouse v. Burley* that the matters considered by me were not even touched upon. Consequently, it appears that the attention of Judge Caleb R. Layton,III was not called to these matters so he did not have occasion to decide the effect of the legislation referred to hereafter. Then, too, the lack of a revision and codification of the Charter and Laws of Wilmington and the many amendments and supplements thereto, make it well nigh impossible to determine what is the effective legislative law regarding Wilmington and traffic on its streets. Consequently, in light of these matters, I do not feel that I am overruling Judge Layton's holding in *Prouse v. Burley;* all that I am doing is directing attention to the legislative history and scope thereof as it affects the problem of traffic on the streets of the City of Wilmington.

After a careful and detailed examination of the many session laws that have been passed since Wilmington became a city, I find that by the terms of Volume 17, *Del. L.,* Chap. 207, § 31, page 435, passed March 9, 1883, the General Assembly of this State, in enacting what is now regarded as the Charter of the City of Wilmington, vested in The Mayor and Council of Wilmington, power—

"* * *, generally to *prescribe* and *regulate the use of the highways,* streets, squares, lanes and alleys *of the city,* and to have and exercise control over the same, subject to the provisions in that behalf hereinafter contained and to the general supervision and control of the General Assembly; * * *." (Emphasis supplied)

I have considered the meaning to be given to the wording "subject to the * * * general supervision and control of the General Assembly" and regard it as having no more meaning

than the general legal proposition that since a municipality is a creature of the legislature of a state, it is always possible for such legislature to change the law or to deprive the municipality of a power theretofore granted.

Sections 114/118 (pages 471/476, Vol. 17, *Del. L.*—which were the sections referred to by the words "hereinafter contained") made reference to streets of the city but in no wise did they limit the power granted by Section 31, expressly or by implication.

By an Act passed April 20, 1887 (Vol. 18, *Del. L.*, Ch. 188, § 1, page 353), those powers that had been vested in and granted to "The Council" by the General Assembly in Vol. 17, *Del. L.*, Ch. 207, § 31, regarding the use and regulation of streets, were taken from "The Council" and vested in an agency termed "Street and Sewer Department", which agency was given—

"* * * *entire jurisdiction and control* within the limits of said city *of the streets*, squares, lanes, roads or alleys thereof, * * *." (Emphasis supplied)

Continuing, the General Assembly gave this same agency—

"* * * the same authority over the said streets, squares, lanes, roads, alleys * * * within the limits of said city, as are now held and exercised by 'The Council' of the said city of Wilmington, under the charter, laws, ordinances and regulations appertaining to or in any manner made for the government of said city. * * *"

■ Based upon this legislation and other acts of the General Assembly, considered hereafter, it is my opinion that the General Assembly thereby surrendered to the Mayor and Council of Wilmington and its agency, the Street and Sewer Department, (now the Department of Public Works), com-

plete and unrestricted power to legislate with respect to the use of the city streets and the traffic problems therein.

My conclusions are bulwarked by the holdings of our Court of Chancery and Supreme Court in *Cutrona v. Wilmington*, 14 *Del. Ch.* 208, 124 *A.* 658 (Ct. Ch. 1924), affirmed by the Supreme Court, 14 *Del. Ch.* 434, 441, 442, at which pages that Court construed the words "entire jurisdiction and control" and considered the meaning to be given to the word "prescribe", 127 *A.* 421, 424, 425. In the absence of legislation clearly repealing or limiting the power granted to the city, the cited sections of the Motor Vehicle Laws, Traffic Regulations and Rules for Driving, adopted by the Street and Sewer Department in 1934, and revised in 1941, are the effective and applicable Rules and not Title 21 *Del. C.* § 4143(b), as is argued by the defendants.

In a quite similar case, *Carey v. Guest*, 78 *Mont.* 415, 258 *P.* 236, 241, (1927) the Supreme Court of Montana held where there had been such a sweeping delegation of authority, such as we find in our statutes, that the city of Helena had power to regulate traffic and speed of motor vehicles within city limits.

It would appear from the opinion in *Boyer v. Delaware Liquor Comm.*, 6 *W. W. Harr.* 224, 233-234, 173 *A.* 522, 526 (Super. Ct. 1934), that this Court has recognized the General Assembly can expressly grant to a municipal corporation the power to adopt ordinances in given fields, and if they do, such ordinances will be upheld, even if in conflict with State legislation.

I would not have it said or understood that I am holding that a municipal corporation can adopt an ordinance in conflict with State laws; what I do hold is that where the General Assembly has surrendered, as I find the case to be here, a power to legislate in a given field to a municipality,

such municipality can legislate within the field, pursuant to an express grant of authority, and where it does the ordinance may supercede, within the city limits, the State law.

There are other evidences of surrender on the part of the General Assembly of jurisdiction in traffic matters to the City of Wilmington. Thus, in Title 17, § 134(a), *Del. Code*, it is provided that—

"The Department shall have no power, authority, or jurisdiction of the streets of any incorporated city or town, except as otherwise provided in this section, unless such power, authority and jurisdiction shall be voluntarily given and surrendered by such city or town to the Department, and then only upon such terms as the Department shall prescribe." Then, in Vol. 36, *Del. L.* Ch. 10, § 100(b), the General Assembly set forth the right of way limitations, applicable to automobiles on through streets, as well as those entering so-called through streets, as well as to § 100(f) of the same volume and chapter, which specifically permitted incorporated cities to legislate in this field. Title 21 *Del. C.* §§ 505 and 506, which were amended by Vol. 49, *Del. L.*, Ch. 179, § 2, provided:

"The provisions of this Act shall in no way apply or relate to the city of Wilmington."

See also Vol. 36, *Del. L.*, § 95(b) of Ch. 10 (now 21 *Del. Code* § 4136) and Vol. 36, *Del. L.*, Ch. 10, § 112 (now 21 *Del. Code* § 4103 and § 4104).

These citations evidence an intent on the part of the General Assembly to recognize power generally in municipalities, and specifically in Wilmington, to legislate on the enumerated matters in the area of traffic control. It clearly appears to me that if and when municipalities do enact ordi-

nances within the permitted areas, the usual and general rule that State laws ordinarily prevail over municipal ordinances in the event of a conflict between them, see 62 *C. J. S.* Municipal Corporations § 143, is not applicable. Rather, such ordinances should be regarded as adopted pursuant to an express grant of authority in an area of law established by the General Assembly.

Counsel for the defendants have argued earnestly that the result reached by me will give rise to anomalies in traffic laws; that may very well be and I must say that I am impressed with such argument. On the other hand, it appears to me that the General Assembly has clearly evidenced an intent that it wants it this way. The power to correct such anomalous situations rests in the General Assembly; if that Body considers the result reached in this case is undesirable, it has the power to amend the law, but it is not for the Courts to ignore the plainly written language which appears in the statutes cited in an endeavor to establish a uniform system of traffic laws.

I am unable to comprehend defendants' purpose in filing the DiSabatino affidavit, except that it tended to show a conflict of facts where none appeared from Mrs. Ellis' deposition. Reading the deposition and the affidavit together, it clearly appears that Mrs. Ellis entered the intersection first and, hence, had the right of way over Mr. DiSabatino as he drove east on West Fourth Street toward the intersection. Mrs. Ellis said that the front of her car was about five feet from the north curb of West Fourth Street. The Ellis car is 18 feet long. 18 plus 5 equals 23. The front of Mr. DiSabatino's car struck the left rear of the Ellis car. This shows fairly clearly that the point of collision was mid-way in the intersection, since West Fourth Street is just a few inches less than 50 feet wide at the intersection.

For the purposes of this case the intersection must be regarded as the area lying within the east and west curb lines of the east lane of Bancroft Parkway and the north and south curb lines of West Fourth Street; the areas lying within the west curb line of the west lane of Bancroft Parkway and the west curb line of the east lane of Bancroft Parkway are not be be considered.

Our Supreme Court in *Floyd v. Lipka*, 1 *Storey* 487, 148 *A.* 2d 541 (Sup. Ct. 1959) set forth some quite interesting and pertinent legal principles that a Court must consider in determining whether or not the plaintiff is contributorily negligent and, thus, barred from asserting liability.

First of all, said the Court (1 *Storey* at p. 488, 148 *A.* 2d at p. 544), the evidence is to be viewed "in the light most favorable to plaintiff".

Secondly, the Court ruled (1 *Storey* at p. 491, 148 *A.* 2d at p. 544):

"Contributory negligence becomes a question of law for the court's decision only when the court is impelled to find from the facts that reasonable men can draw therefrom but one inference pointing clearly to the negligence of the plaintiff contributing to the accident. * * *"

Thirdly, the Court ruled (1 *Storey* at p. 491, 148 *A.* 2d at p. 544) that the plaintiff "had the right to assume that" the defendant would obey the law applicable to him and would not violate such law. The Supreme Court ruled similarly in *Robinson v. Meding*, 2 *Storey*, 578, 163 *A.* 2d 272, 277 (Sup. Ct. 1960).

Applying these principles to the evidence in this case it clearly appears that Mrs. Ellis, before driving into the intersection, stopped her car, not once, but twice, and that on both occasions she looked for oncoming traffic in both directions.

True, her vision was obscured, in part, by the taxicab parked at the south curb of West Fourth Street in the grass plot area within the west curb of the east lane and the east curb of the west lane, and between the north and south curb lines of West Fourth Street. Mr. DiSabatino's vision was likewise obscured by this same taxicab. There was no obligation on Mrs. Ellis' part to pause at the stop sign until the taxicab moved, so as to clear her vision. Since the Traffic Regulations of the City of Wilmington gave the right of way to Mrs. Ellis, Mr. DiSabatino was under a further duty to yield that right of way to Mrs. Ellis.

I consider that *Floyd v. Lipka, supra,* is determinative here. It there appeared that the plaintiff, before entering the intersection, had looked for oncoming traffic, 1 *Storey* at p. 490, 148 *A.* 2d at p. 543, and looked again before proceeding. Under those circumstances the Supreme Court ruled "that the question of plaintiff's contributory negligence was for the jury to determine and that the trial judge erred in holding as a matter of law that plaintiff was guilty of contributory negligence for failing to look again or to continue to look while crossing the intersection".

Since my ruling is that the General Assembly has given "entire jurisdiction and control" over the streets of Wilmington to the Street and Sewer Department (now Department of Public Works), with power to "prescribe" in such matters, see *Cutrona v. Wilmington, supra,* and that for this reason the Motor Vehicle Laws, Traffic Regulations and Rules for Driving, adopted by the Street and Sewer Department in 1934, and revised in 1941, are the effective and applicable Rules of Traffic, and not Title 21 *Del. C.* § 4143(b), I conclude that defendants' motion for summary judgment must be denied.

Order on notice.

2.

St. Thomas R. C. Church
and School

12' 9"    49' 9"    20'

22'-0"

12'-9"

7'-7"

WEST

113' - 6"

9'-4"

BANCROFT

Taxi Cab Parked
here

4 TH ST.

PKWY

EAST

2'-1"

2'-3"

12'-9"

Stop
Sign

11'-9"

30'