ERNEST A. DISABATINO and ERNEST DISABATINO & SONS, INC., a Delaware corporation, Appellants, v. LOUISE A. ELLIS and ROBERT B. ELLIS, Appellees.

(*September* 12, 1962.)

SOUTHERLAND, Chief Justice, and WOLCOTT, Justice, and DUFFY, Judge, sitting.

*F. Alton Tybout* (of Prickett, Prickett and Tybout) for Appellants.

*Robert C. O'Hora* and *John P. Daley* for Appellees.

Supreme Court of the State of Delaware, No. 23, 1962.

DUFFY, J.:

This action arises out of a collision of two cars at Fourth Street and Bancroft Parkway in Wilmington. After discovery by both parties, defendants moved for summary judgment, which was denied. Del. Super., 178 A. 2d 471. The case is here on appeal from that decision. The facts are these:

On November 12, 1959, about 3 P.M., Louise A. Ellis, one of the plaintiffs, was driving her car north on Bancroft Parkway. The weather was clear, the sun was shining. Bancroft Parkway has north and southbound lanes separated by a grass plot. A stop sign controls northbound traffic on Bancroft Parkway at its intersection with Fourth Street.

As Mrs. Ellis approached Fourth Street, she stopped about ten feet from the south curb line thereof to permit children to cross Bancroft Parkway. She remained stopped for two or three minutes, or longer. She then moved to the intersection and stopped again.

On deposition, Mrs. Ellis testified that she looked in both directions on Fourth Street before entering the intersection. She did not see any car moving toward her from her right, *i.e.*, from the east. She did not see any car moving toward her from her left, *i.e.*, from the west.

Mrs. Ellis proceeded into the intersection intending to continue north on Bancroft Parkway. As she drove she watched children at play on the north side of Fourth Street. While she was in the intersection, a car driven by defendant Ernest A. DiSabatino came from her left and struck her car at the back of the left rear wheel. Mrs. Ellis first became aware of Mr. DiSabatino's car when she heard the sound of his brakes; at that time it was a few feet from her car. She was not able to estimate its speed but thinks it was going "pretty fast".

Mr. DiSabatino's affidavit states that he was proceeding east on Fourth Street at about twenty miles per hour. As he approached Bancroft Parkway, his view of the street area near the stop sign on the Parkway was partially obscured by a taxicab parked on the south side of Fourth Street; Mrs. Ellis' car started to cross the intersection in front of him, he applied brakes and skidded into it.

Mrs. Ellis' view in the direction from which Mr. DiSabatino was coming was also obscured by the taxicab; she may or may not have looked in that direction, that is, toward the west, after she got to a point in Fourth Street where she could see beyond the taxicab.

The appeal presents two questions for decision:

(1) Was Mrs. Ellis' duty at the stop sign determined by a State statute or by a Wilmington traffic regulation?

(2) Was Mrs. Ellis contributorily negligent as a matter of law?

The court below held that the City regulation determined Mrs. Ellis' duty and that she was not contributorily negligent as a matter of law.

We begin by noting the difference between the statute and the regulation.

21 *Del. C.* § 4143 provides:

"(a) Whenever a stop sign, notifying drivers to come to a full stop, has been erected by the proper State or local authorities as provided in this title, it shall be unlawful for the driver of any vehicle to fail to stop in obedience thereto.

"(b) The operator of any vehicle who has come to a full stop as provided in subsection (a) of this section, shall not enter into, upon or across, such highway or street until such movement can be made in safety."

Section 602(c) of the Wilmington Street and Sewer Department's "Motor Vehicle Laws, Traffic Regulations and Rules for Driving" provides:

"The driver of a vehicle or coach who has stopped or slowed down as required by these Rules and Regulations at the intersection with a 'Boulevard' or 'Through Traffic' street, or in obedience to a 'Stop' or 'Slow' sign at any intersection, shall yield to other vehicles and coaches within the intersection or approaching so closely on the intersecting street as to constitute an immediate hazard, but said driver having so yielded may proceed and other vehicles and coaches approaching the intersection on the intersecting street shall yield to the vehicle or coach so proceeding onto or crossing the intersecting street."

Differences between these two acts are readily apparent. The statute makes stopping mandatory and then commands the driver to "not enter into, upon or across, such highway or street until such movement can be made in safety."

The regulation, on the other hand, obliges the driver to stop and then yield to other vehicles "within the intersection or approaching so closely * * * as to constitute an immediate hazard"; but, having yielded to those whose proximity makes them "an immediate hazard", the driver may then proceed under a right to have others yield to him.

We agree with the learned court below that there are differences of substance between these two acts. It seems quite clear that the statute imposes a higher duty upon the driver controlled by the stop sign than does the regulation; under the latter he must yield only to those close enough to be an "immediate hazard", while under the statute he may not go until he can do so "in safety".

Which, then, of these two acts was applicable to Mrs. Ellis? Was she obliged to wait until she could cross "in safety"? Or was she obliged to yield to Mr. DiSabatino only if he was so close as to be an "immediate hazard"? This brings us to the issue which is critical in determining the first question raised in this appeal.

The lower court's finding that the regulation fixed a driver's duty at a stop sign in Wilmington was based on a construction of two statutes, the first of which was a part of a broad act revising and consolidating statutes relating to the City of Wilmington; 17 *L. Del.*, Ch. 207, § 31 (April 13, 1883) provides, in part, that "The Council" shall have power,

"* * * generally to prescribe and regulate the use of the highways, streets, squares, lanes and alleys of the city, and to have and exercise control over the same, subject to the provisions in that behalf hereinafter contained and to the general supervision and control of the General Assembly * * *."

The second statute provided that certain powers theretofore exercised by "The Mayor and Council of Wilmington" were to be exercised through a new agency, the "Street and Sewer Department". 18 *L. Del.*, Ch. 188, § 1 (April 20, 1887). Among other things, this agency was,

"* * * to have entire jurisdiction and control within the limits of said city of the streets, squares, lanes, roads or alleys thereof * * *."

The court concluded, and plaintiffs argue here, that by

these acts the General Assembly surrendered to The Mayor and Council of Wilmington and its agency, the Street and Sewer Department, complete and unrestricted power to legislate with respect to the use of the City streets and the traffic problems therein.

Our analysis of the question leads us to a different conclusion.

■ We begin with the general proposition that a local traffic ordinance or regulation is not valid if it conflicts with a statute relating to the same subject. A concise statement of this principle is given at 147 A. L. R. 522:

"As stated in the original annotations [21 A. L. R. 1186 and 64 A. L. R. 993], it is well settled as a general rule that municipalities, having the power to regulate the use of their streets, may enact valid rules and regulations for the government of motor vehicles within their precincts, so long as they are not in conflict with or repugnant to legislative enactments governing the use of such vehicles; but that such ordinances are invalid if they are in conflict with statutes relating to the same subject. Later cases also support this proposition."

We do not understand plaintiffs to dispute this as general law. They contend, however, that it is not applicable because of the express legislative grant to the City of Wilmington in the 1883 and 1887 statutes. Those statutes do delegate broad powers to the City, but to equate them to "surrender" is to read in them more than we can find.

We note that the act of 1883 gave "The Council" general powers in the way of street layout, design and related matters. Power was also given "generally to prescribe and regulate the use of the highways, streets" and so on. But this was followed immediately by language of limitation: "to have and exercise control over the same [subject] * * * to

the general supervision and control of the General Assembly." What do these words mean? Under plaintiffs' view of the statute they would be without meaning. But it seems to us that they have meaning and they mean precisely what they plainly say: the General Assembly reserved to itself a general right to supervise and control the exercise of the powers given to the city.

It is argued that these words of limitation are surplusage because of the General Assembly's well-established right to alter, enlarge or revoke the power it grants to a legislative creature. But this ignores two significant aspects of the question. First, the language of limitation was in fact used in connection with the grant of power here considered; it is there. And under familiar principles of statutory construction effect must be given, if possible, to every part of the statute so that no part will be inoperative. *Metropolitan Life Ins. Co. v. Jacobs*, 1 Terry 54, 1 A. 2d 603. Second, the language of limitation was *not* used in subsequent parts of the same paragraph of the same statute granting powers with respect to various other matters; it is not elsewhere.

Hence we conclude that as to 17 *L. Del.*, Ch. 207, § 31 the General Assembly specifically made its grant of jurisdiction over the use of Wilmington streets and highways subject to its supervision and control. And, for present purposes at least, 18 *L. Del.*, Ch. 188, § 1 did not enlarge that jurisdiction. The primary purpose of that statute was to transfer to the newly-created Street and Sewer Department the power over City streets formerly exercised directly by "The Council". We find nothing in the statute amounting to a surrender by the General Assembly of its rights here involved.

It therefore follows that the regulation in question must give way to the State statute since there are differences in substance between them. We hold invalid such provisions

of the Street and Sewer Department regulation as prescribe for an automobile driver a standard of conduct different from that prescribed by the statute.

We note that this result is in harmony with an earlier decision of the Superior Court which held invalid a Wilmington traffic regulation because it did not comply with a State statute governing through streets. *Prouse v. Burley,* 10 Terry 537, 121 A. 2d 291.

Under the view we take of the statutes, authorities relating to repeal of specific acts by general legislation are not in point.

The decision of this court in *Cutrona v. Mayor and Council of Wilmington,* 14 Del. Ch. 434, 127 A. 421, is not in conflict with our decision here. That case considered whether the Street and Sewer Department had the power to make unlawful the operation of a public bus on Wilmington streets without a permit. It was held that the Department had such power. While the court was there concerned with what powers were granted to the City and to the Department by 17 *L. Del.,* Ch. 207, and 18 *L. Del.,* Ch. 188, there was no question of any conflict with a State statute. The statute here in question was not enacted until 1929, when it was included as a part of a uniform set of motor vehicle statutes. 36 *L. Del.,* Ch. 10.

The result which follows from our construction of the statutes is consistent with what we take to be a fundamental public policy in the motor vehicle traffic control laws enacted by various sessions of the General Assembly. That policy is to provide for uniform rules of the road and standards of duty except to the extent that exceptions are clearly stated. This is made manifest by 21 *Del. C.* § 4103, which prohibits local authorities from enacting or enforcing any rule or regulation contrary to the provisions of the chapter on driving regulations "except as expressly authorized by law".

This brings us to the second question raised in the appeal: Was Mrs. Ellis contributorily negligent as a matter of law?

As Mrs. Ellis waited at the stop sign, she was under a duty not to enter into, upon or across Fourth Street until such a movement could be made in safety. Thus she was, under the statutory scheme for traffic control, the "unfavored" driver in contrast with Mr. DiSabatino, who was proceeding on the "favored" street.

We agree with Judge Terry's conclusion in *Rumble v. Lingo*, 1 Storey 417, 147 A. 2d 511, that the language of 21 *Del. C.* § 4143 is free from ambiguity and hence leaves no room for construction. And where the language of a statute is plain and conveys a clear and definite meaning, the courts will give to the statute the exact meaning conveyed by the language. *Federal United Corporation v. Havender*, 24 Del. Ch. 318, 11 A. 2d 331.

As Judge Terry noted, the statute requires the driver of a motor vehicle, who has stopped his vehicle in obedience to a sign, to refrain from negotiating the intersection until he can do so in safety. It is unnecessary for us to consider the scope of the presumption that is raised when the statute is violated. It is sufficient to say that in the case at bar when Mrs. Ellis attempted to negotiate the intersection—when she tried to cross Fourth Street—she could not do so in safety.

The record shows that the intersection is an open one, at least in the direction from which Mr. DiSabatino was coming. The streets are straight. The weather was clear. There was nothing unusual about the way in which Mr. DiSabatino's car approached the intersection. And as he approached, Mrs. Ellis' car attempted to cross in front of him. He applied brakes and skidded into the left side of her car. Considering the speed at which the two cars were moving—20 miles an hour by Mr. DiSabatino, 5 miles an hour by Mrs. Ellis—, the

open character of the intersection, the straight line of travel by Mr. DiSabatino, and the undisputed facts as to what took place, it conclusively appears that Mr. DiSabatino's car was proceeding east on Fourth Street in such a manner and in such proximity to Bancroft Parkway that a movement into or across the intersection could not be made in safety by Mrs. Ellis. And her attempt to cross, under the circumstances, was at least a contributing cause of the accident. Hence we hold that Mrs. Ellis violated 21 *Del. C.* § 4143(b) and that she was contributorily negligent as a matter of law.

We also note that Mrs. Ellis was negligent in failing to maintain a proper lookout. Given the open character of the intersection and the fact that Mr. DiSabatino had been proceeding east on Fourth Street for at least four blocks, the only reasonable inference is that his car was there, on Fourth Street, to be seen by Mrs. Ellis. And this is so as to both before and after the parked taxicab partially obscured her view. In either event, her failure to look, or her failure to see what was in plain view to be seen was negligence. *James v. Krause*, 6 Terry 404, 75 A. 2d 237. And while proximate cause is ordinarily a question for the jury, *Ebersole v. Lowengrub*, Del., 180 A. 2d 467, the only possible inference from the undisputed evidence is that Mrs. Ellis' failure to maintain a proper lookout was a contributing cause of the accident.

The judgment below is reversed and the record is remanded with instructions to enter judgment for defendants.