**Ida McMILIN, Individually, as the Personal Representative of Arthur J. McMilin, and as the Next Friend of Arthur J. McMilin, Jr., Libelant,**

v.

**The UNITED STATES of America, Defendant.**

**No. 1906.**

United States District Court
D. Delaware.

Sept. 26, 1968.

Amended Sept. 30, 1968.

Victor Battaglia, Biggs & Battaglia, Wilmington, Del., for libelant.

Alexander Greenfeld, U. S. Atty., Wilmington, Del., and Harold G. Wilson, Attorney, Department of Justice, Washington, D. C., for defendant.

## OPINION

STEEL, District Judge:

This is an action for damages brought by libelant, the widow of Arthur J. Mc-Milin, Sr., in her individual capacity and as his personal representative, and also as the next friend of her son, Arthur J. McMilin, Jr., a minor, against the United States. The suit arises out of a boating accident which occurred on May 30, 1964, when the cabin cruiser Jo Jo owned by McMilin, Sr., struck the Pea Patch Island jetty, or dike as it is sometimes referred to, in the Delaware River.[1] Libelant seeks damages for the drowning of McMilin, Sr., in the river after the accident (Complaint para. 4), and on behalf of McMilin, Jr., in part because of his alleged exposure and shock from being in the river for approximately 13 hours after the accident. (Complaint para. 10).

The subject matter of the litigation is within the admiralty and maritime jurisdiction of the Court, 28 U.S.C. § 1333 (1964). Both parties agree that the action is authorized by the Suits in Admiralty Act, 46 U.S.C. § 742 (1964).

By agreement the trial was limited to a determination of fault, reserving the question of damages, depending upon the outcome of the fault-finding, until trial at a later date. (PTO (f) (5)).[2]

Libelant's theory that the collision was due to the fault of the Government is based upon the claim that the Government, well knowing the hazardous condition of the jetty, negligently failed to provide adequate warning to navigators of the hazard which the jetty presented. The Government denies it was negligent and contends that the accident was due solely to the negligence of McMilin, Sr.

The Jo Jo was put in the water near the Third Street Bridge in Wilmington for a voyage to Delaware City, approximately 15 nautical miles away. (T. 7–8, D.F.F. 3, 6). Without being more specific it is sufficient to note that this was about the end of the day on May 30, 1964. Aboard her during the voyage was McMilin, Sr., the operator, his 11-year-old son, McMilin, Jr., and an adult friend, Sanford Hunt. (T. 8, 141, D.F.F. 2). On the trip the Jo Jo traveled about 14 miles per hour and maintained this speed until she hit the jetty. (T. 8, 49, 51).

At the time of impact all three persons aboard her were at the forward end of the cabin. (T. 8, 76). McMilin, Sr. and McMilin, Jr. were seated in chairs and Hunt stood between them looking ahead. (T. 8, 51). Both McMilin, Jr. and Hunt testified that they were not paying attention to navigation, but had left that job of operation to McMilin, Sr. (T. 51–52, 142). Since the vessel had no facility for charging its storage battery, she was operating without any lights or horn. (T. 29–31). In addition, the vessel was not equipped with chart, compass, flashlight or flare. (T. 45, 66). McMilin, Sr. knew the river. Upon impact with the jetty he remarked that he had hit the jetty and should have known of its presence. (T. 52).

All aboard the Jo Jo were able to climb to the top of the jetty after she struck it. Hunt testified that he crawled along the top of the dike in a southernly direction to seek assistance, leaving the two McMilins where they had mounted it.

1. Plaintiff's Requested Finding of Fact 1 seeks a determination that the accident occurred on May 24, 1964. The Pre-trial Order para. (c) (1) states that the accident occurred on May 30, 1964. The evidence supports this latter conclusion.

2. "PTO" is Pre-trial Order dated June 6, 1968; "T." is Transcript; "D.F.F." is Defendant's Proposed Finding of Fact; "L.F.F." is Libelant's Proposed Finding of Fact; "Px" is Libelant's Exhibit; "Gx" is Defendant's Exhibit.

(T. 10–14). Sometime later Hunt was rescued by the dredge Goethals. (T. 16, 73–74). When the rescue party returned to where Hunt had left the two McMilins, they were gone. (T. 74). The following morning a Coast Guard helicopter rescued McMilin, Jr. in an unconscious condition. (T. 161, 330). He was taken to the hospital and later released. (T. 161). About the same time a tanker discovered the body of McMilin, Sr. in the river. (T. 152, 164, 330).

Pea Patch Island jetty is a legally erected structure maintained by the United States Army Corps of Engineers. (PTO (c) (5), T. 128). It serves to prevent the dredged channel of the river from being shoaled up with fill. (T. 128). The jetty is 3 nautical miles long and parallels the arc of the navigable channel in the river (Gx–1). At its southern tip it joins Pea Patch Island, now abandoned but once used by the Government as a fort. (T. 128).

There are five aids to navigation situated on the dike, spaced approximately equidistant from each other. Each aid is designated by a letter. The southernmost aid closest to the Island is designated A; the one on the extreme northern tip is designated E. (Gx–1). Each aid consists of a raised stone pile platform supporting a black "skeleton tower", on top of which is a small white "tankhouse". A light is affixed to the top of each tankhouse. The heights of the lights vary from 21 feet to 30 feet above mean high water. (T. 289–90). The lights flash green at intervals of 4 to 6 seconds, except light D which is a flashing white light. (Gx–1, T. 4). Both the tankhouses and their supporting structures in the day, and the light at night or in periods of low visibility, operate as aids to navigation. (T. 270–71). The lights are controlled by photo-electric cells which switch on sometime during the thirty-minute period following sunset and during other earlier periods of decreased light. (T. 271–73). The jetty and lights are shown on the

official navigation chart for the Delaware River published by the United States Coast and Geodetic Survey. The ship channel is also shown on the chart. The outer limits of the ship channel are defined on the chart by buoys and its center is identified by range lights. (Gx–1, T. 197–99). Anyone who properly navigates a vessel in the ship channel is assured of passing the jetty with safety.

Three factual questions are raised by the arguments:

(1) What part of the jetty did the Jo Jo strike;

(2) At what time did she run onto the jetty;

(3) Was the jetty at point and time of impact visible or submerged?

The parties have stipulated that the Jo Jo struck the jetty at its extreme northern end (PTO (c) (1)); and libelant, without objection from the Government, has requested a finding to this effect. (L.F.F. 1). Libelant has not sought to modify the Pre-trial Order.

Nevertheless Hunt's testimony will be considered. He stated that after the collision the occupants of the Jo Jo crawled up on the jetty, that thereafter he walked or crawled about a mile southward on top of the jetty to seek help, and that at the time the jetty was 18 to 20 inches under water. (T. 10–14).

On August 26, 1968, the Court, with consent of counsel and accompanied by them, cruised in a 30-foot Coast Guard boat in the vicinity of the jetty from 6:45 p. m. to 8:30 p. m.[3] The purpose of this cruise was to enable the Court to observe the conditions of visibility and the extent to which the jetty was exposed or submerged. The observations were made with reference to the then time of sunset and the then condition of the tides so as to place the Court as nearly as possible in the same position that the parties were in on May 30, 1964, having in mind the time of sunset and condition of the tides on this latter date

---

3. All time referred to is Daylight Saving Time.

when the accident occurred. In general, the conditions on the two dates were the same. The evenings of May 30, 1964 and August 26, 1968 were both clear. (T. 229, D.F.F. 16). While there was no moon showing on May 30, 1964 (T. 230, 320), and there was a new moon on August 26, 1968, the new moon provided no appreciable light during the hours of inspection. The wind velocity was not substantially different on the two dates although its direction was not the same. (Stipulation dated September 25, 1968).

The jetty between light E on its extreme northern point and light C, about 1,500 yards to the south (Gx–1), was observed at close range by the Court. The structure of the jetty between lights E and D was substantially different from that between lights D and C.

Between lights E and D the jetty consisted of a series of steel dolphins the interiors of which were filled with rocks.[4] By visual estimate, each dolphin was approximately 30 to 40 feet in diameter and was separated from the next dolphin by about 20 to 30 feet of open water.[5] If the Jo Jo had struck the extreme northern end of the jetty, as stipulated, and the parties had mounted it there, Hunt could not possibly have walked along the top of the jetty, as he testified. The water between the dolphins would have made this impossible.

From lights D to C, however, the jetty is a continuous reinforced-concrete wall with sloping sides and a narrow flat top. The top is wide enough for a man to crawl along holding onto the exposed steel reinforcements or to walk along if he had excellent balance. The description of the jetty which Hunt stated he traversed in seeking help fits the portion of the jetty between lights D and C.

Whether the Jo Jo struck the jetty between lights D and C, or the extreme northern end, as stipulated, cannot be determined from the record. It is possible that she did run into the extreme northern end and that before sinking she was propelled or floated to a point between lights D and C, where the parties mounted the jetty. On the other hand, it is possible that the stipulation is erroneous and that the Jo Jo collided with the jetty between lights D and C and the parties climbed upon it close to the point of impact. In view of what is later said in this opinion it makes no difference in the outcome of the case which of these two versions of the facts is correct.

Libelant claims that the portion of the jetty that it ran upon was submerged.

On the assumption that the Jo Jo struck the jetty at 8:00 p. m., as libelant contends, the accident occurred 22 minutes before sunset (D.F.F. 4, T. 211) and 1 hour and 37 minutes before computed low tide on May 30, 1964. (Gx–5, Stipulation dated September 25, 1968). Under the Government's theory that the Jo Jo struck the jetty shortly after 9:00 p. m., the accident would have occurred about 38 minutes after sunset and about 37 minutes before computed low tide. (Gx–5, Stipulation dated September 25, 1968). On August 26, 1968, the Court observed the condition of visibility and the exposure of the jetty at the same times in relation to the hour of sunset and time of computed low tide which existed on May 30, 1964. The conditions under which the observations took place were thus comparable to those which existed when the accident occurred under the theory of each party. At all of the times noted, the Court found the portion of the jetty between lights D and C extending above the river surface by 3 or 4 feet. This portion of the jetty was readily discernible to the Court aboard the cruising boat from remote vantage points. It is clear that the navigator of the Jo Jo should have seen the jetty and avoided running into it. The Court also found at all of the times referred to that the dolphins between lights E and D rose above the surface

---

4. The dolphins appeared to be constructed of sheet-steel piling driven into a circle so that the edges interlocked.

5. At one point, closer to light D than to light E, 6 or 8 dolphins were submerged.

of the river by 2 to 4 feet in most places. The long line of dolphins was clearly visible long before they were reached and no navigator would have collided with one of them unless he were extremely careless.[6] Furthermore, if, as libelant contends, the Jo Jo ran into the extreme northern end of the jetty, the imposing structure which served to support light E provided him with a warning of the most obvious kind. This is true without regard to the light E which began to flash shortly after sunset.

■ The accident occurred within the territorial limits of Delaware, State of New Jersey v. State of Delaware, 291 U.S. 361, 54 S.Ct. 407, 78 L.Ed. 847 (1934) (opinion of Court), 295 U.S. 694, 700, 55 S.Ct. 907, 79 L.Ed. 1659 (1934) (decree and attached map), on navigable waters. The ultimate effect of Hess, Adm'r v. United States, 361 U.S. 314, 317–319, 80 S.Ct. 341, 4 L.Ed.2d 305 (1960) is to make the substantive law of Delaware controlling.

■■ The record establishes that the accident was caused solely by the negligence of McMilin, Sr. His negligence consisted of failing to keep a proper lookout, Wootten v. Kiger, 226 A.2d 238 (Del. Supreme Ct.1967); DiSabatino v. Ellis, 184 A.2d 469, 474 (Del.Supreme Ct. 1962); Jewell v. Pennsylvania R. R. Co., 183 A.2d 193, 196 (Del.Supreme Ct. 1962); Eskridge v. Ruth, 9 Terry 439, 105 A.2d 785 (Del.Super.Ct.1953); Burk v. Artesian Water Co., 8 Terry 405, 91 A.2d 545, 548 (Del.Super.Ct. 1952), operating the Jo Jo at an excessive rate of speed with actual knowledge that he was in the vicinity of the jetty, and in failing to equip his boat with a Coast and Geodetic Survey navigational chart, or an equivalent. In the circumstances of this case, he is chargeable with constructive knowledge of the critical information, including the existence and location of the jetty, which such a

chart discloses. Thornton v. United States, 236 F.Supp. 651, 652–653 (S.D. Miss.1964); Thompson v. Consolidated Gas, Elec. Light & Power Co., 111 F. Supp. 719, 729 (D.Md.1953); cf. Southern Maryland Elec. Co-op. v. Blanchard, 239 Md. 481, 212 A.2d 301, 306 (Md.Ct. App.1965) (citing with approval Thompson v. Consolidated Gas, Elec. Light & Power Co., supra). While no Delaware case has been found which holds that it is negligent for an operator of a vessel to fail to equip his vessel with such a chart, it is probable that a Delaware Court would so hold under the circumstances of this case, if the question were presented to it.

In arguing that the Government has failed to provide adequate warnings of the danger to navigators occasioned by the existence of the jetty, libelant points out that over the years a large number of accidents have occurred as a result of boats colliding with the jetty. These include a Coast Guard boat, fire rescue boats, and other vessels. Approximately 12 accidents per year have occurred there since 1951. In May of 1964, the month of the Jo Jo's accident, 4 or 5 other boats collided with the jetty. On the night when the Jo Jo ran afoul of it, the Who Cares crashed into it at a later hour. (T. 15–16, 73, 319–21). The evidence fails to reveal on what part of the three-mile jetty these accidents occurred, whether they took place in the daytime or in the dark of night, in foggy or fair weather, or any other circumstances relevant to determining whether they were due to faulty warnings by the Government, to the carelessness of the operators of the vessels, or to both. These accidents may be relevant to establish notice to the Government that the jetty, under some circumstances, was a hazard to navigation. Wilmington Housing Authority v. Williamson, 228 A.2d 782 (Del. Supreme Ct.1967); Jewell v. Pennsylvania R. R. Co., supra; Evans v. Penn-

---

6. While 6 or possibly 8 of the dolphins nearer light D than light E were submerged, no contention is made by libelant that the Jo Jo collided with one of these. The fact that the jetty, where the Jo Jo encountered it, was not submerged tends to be confirmed by the photograph which shows a hole in its bow well above its water line. (Gx–2).

**356**

sylvania R. R. Co., 225 F.2d 205, 70 A.L.R.2d 158 (3d Cir. 1958) (discussing Delaware law). But whatever the adequacy or inadequacy of the warning provided by the Government may have been under other conditions, it is clear that McMilin, Sr. had sufficient warning of the existence of the jetty before he ran upon it and that the accident was solely the result of his own negligence.

If a reviewing court should find, contrary to this Court's conclusion, that the accident was due to the Government's negligence, but that, consistent with this Court's finding, McMilin, Sr.'s negligence was also a cause of the accident, libelant still cannot recover under the Delaware Wrongful Death Act for the death of McMilin, Sr. Libelant would be barred by McMilin, Sr.'s contributory negligence. Franklin v. Salminen, 222 A.2d 261 (Del.Supreme Ct.1966); Frelick v. Homeopathic Hosp. Ass'n of Del., 1 Storey 568, 150 A.2d 17, 20 (Del.Super. Ct.1966); Burk v. Artesian Water Co., supra; Goldstein v. People's Ry. Co., 5 Pennew. 306, 60 A. 975 (Del.Super.Ct. 1905).

If both the Government and McMilin, Sr. were thus found negligent by a reviewing court, the question would arise whether under Delaware law libelant could recover on behalf of McMilin, Jr. This question in turn would depend upon whether McMilin, Jr. was, or as a minor could be, contributorily negligent, and if not, whether McMilin, Sr.'s negligence can be imputed to him. As to this latter problem, see McKeon v. Goldstein, 3 Storey 24, 164 A.2d 260 (Del. Supreme Ct.1960); Messick v. Delaware Elec. Power Co., 6 W.W.Harr. 354, 175 A. 772 (Del.Super.Ct.1935); Brown v. Schendelman, 4 W.W.Harr. 50, 143 A. 42 (Del.Super.Ct.1928); Kyne v. Wilmington & N. R. Co., 8 Houst. 185, 14 A. 922, 929 (Del.Super.Ct.1888); Prosser on Torts 504 (3d ed. 1964); id. 301 (2d ed. 1955).

The foregoing constitutes the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

The action will be dismissed.