Patrick J. DOYLE, Administrator of the Estate of John White Fulton, Deceased, Plaintiff,

v.

UNITED STATES of America and the South Carolina State Highway Department, Defendants and Third-party Plaintiffs.

Carol Lynn FEAGA, Plaintiff,

v.

UNITED STATES of America and the South Carolina State Highway Department, Defendants and Third-party Plaintiffs.

Civ. A. Nos. 75–1781, 75–1783.

United States District Court, D. South Carolina, Charleston Division.

Nov. 18, 1977.

As Amended Nov. 23, 1977.

William S. Cowan, Georgetown, S. C., for plaintiff Doyle.

D. A. Brockinton, Jr., Charleston, S. C., for plaintiff Feaga.

John T. Shepherd, Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., for defendant United States.

Ellison D. Smith, IV, Charleston, S. C., for defendant South Carolina State Highway Dept.

## ORDER

BLATT, District Judge.

These cases, consolidated for trial and heard by this court on March 28–31, 1977, arise from an October 9, 1974, collision between a motor boat operated by one John White Fulton, plaintiff-Doyle's decedent, in which plaintiff, Carol Lynn Feaga, was riding, and the guide cable used in the operation of the South Island Cable ferry. The Doyle complaint filed October 9, 1975, sought recovery against the United States and the South Carolina Highway Department, as joint tort-feasors, for the wrongful death of the aforesaid John White Fulton. The Feaga complaint, filed on the same day, sought recovery for personal injuries against the same defendants. The defendants answered, denying liability, and, at the same time, asserting cross-claims against each other for contribution. Prior to trial, the plaintiffs settled their claims against the defendant, South Carolina State Highway Department, and on March 18, 1977, both defendants dismissed with prejudice their respective cross-claims for indemnification or contribution. This series of acts left for trial the claims of both plaintiffs against the defendant, United States of America. Having heard the testimony, studied the exhibits, and, at the request of all parties, visited the scene of the collision, the court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

A. *Background and Description of Ferry, Approaches, and Area.*

(1) Prior to 1900, as part of the construction of the Intracoastal Waterway, the United States Corps of Engineers (Corps) dug a canal in Georgetown County, South Carolina, from Winyah Bay to the Santee Delta. This canal, known as the Estherville-Minim Canal, runs generally in a north-south direction and separates South Island on the east from the remainder of Georgetown County on the west. After completion of the canal, access from the mainland to South Island was afforded by the construction of a wooden bridge, which bridge was destroyed many years ago; thereafter, access to South Island was made available by ferry boat.

(2) The Intracoastal Waterway is a part of the navigable waters of the United States and is a highway for barge and pleasure boat traffic. Since its original construction, the Corps has dredged and maintained the canal, which is approximately 300 feet wide.

(3) Approximately 5,000 vessels, mostly pleasure boats, use the canal each year. The average speed of the vessels varies with the type and size of the vessel; however, thirty-five miles per hour is a speed often utilized by boaters proceeding through the canal.

(4) The cable ferry presently in use was partially reconstructed in 1968. The water at the site of the ferry is subject to the ebb and flow of the tide; therefore, the ferry boat is stabilized by a ⅝″ steel cable which is permanently attached to the mainland side of the canal. The ferry boat, which is docked on the South Island side when not in use, is manned by one operator, and when a crossing is desired, the operator activates an engine located on the "hill", or high ground of South Island, directly behind the ferry mooring, which causes the guide cable to become taut and rise to a horizontal position several feet above the water. The ferry boat is fifty feet long, twenty feet wide, and weighs approximately twenty tons. It is propelled by the use of a cable propulsion system which employs an eight horsepower engine to activate a double drum which, in turn, pulls the ferry back and forth across the waterway. When the ferry is not in use, the guide cable is lowered to the bottom of the waterway. Constant exposure to salt water causes the guide cable to have a muddy, brown hue.

(5) As approached by a boater proceeding generally south on a fall afternoon, the rust colored steel guide cable, when above the surface of the water, blends into a background of marsh and trees; and in the late afternoon, the sun, if shining, creates a glare on the water surface and tends to blind a boatsman proceeding in that direction. After the ferry boat moves from the island to the mainland side, there is ample waterway behind the ferry for a vessel to pass; however, the cable abaft the ferry remains taut and obstructs all passage on the waterway. The ferry boat operator can lower the cable only after returning to the island side, exiting from the ferry, and pulling the control switch. On a normal trip, the cable is taut one to four feet above the waterway for approximately five to ten minutes. During a typical twenty-four hour period, the ferry makes twelve to twenty round trips to the mainland.

(6) In 1947, the South Carolina Highway Department, pursuant to an Act of the South Carolina General Assembly—(now S.C.Code § 57–15–140 (1976))—assumed the operation and maintenance of this ferry.

(7) In January, 1967, the State Highway Department erected, upstream and downstream of the cable, signs warning of the ferry's presence. The 4′ × 6′ signs were on both sides of the channel and stated simply, "Caution—Ferry Crossing–.10 mile." These signs completely failed to inform boaters of the danger posed by the taut cable when the ferry was in operation. Five red flashing lights were located on the ferry boat, and a warning siren could be sounded by the operator from the island side, but this siren was not usable after the ferry had commenced a trip.

(8) The ferry is capable of transporting two automobiles with passengers across the waterway. The operator's cabin is on the south side, in the center of the ferry, and it contains a manual throttle for activating the engine. The operator, from his cabin, has a clear view of boats approaching from the south. When boats approach from the north, the operator has an unobstructed view except when, as was the case on October 9, 1974, the ferry is transporting a loaded pulpwood truck, and this type of transportation was provided on a regular basis. Proper distribution of weight required loaded pulpwood trucks to be situated in the middle of the ferry boat, and this blocked the operator's view of boats approaching from the north. Once the ferry left the island side, the operator could neither warn approaching traffic of the cable nor could he lower the cable.

(9) From 1955 to 1975, approximately 75 to 100 accidents involving the ferry occurred. Most of the accidents were minor and involved pleasure boats colliding with the cable. For the years 1971 to 1975, the South Carolina Department of Marine and Wildlife Resources investigated seven acci-

dents involving collisions between boats and the cable, and the United States Coast Guard was provided with copies of these reports. The United States Coast Guard for that same period investigated five accidents—(two of which were also investigated by the State agency). Both the South Carolina Highway Department and United States Coast Guard personnel testified that the cable ferry, as it existed on October 9, 1974, constituted a hazard to navigation; to the same effect was the testimony of the South Carolina Marine and Wildlife Resources Department personnel.

## B. *Accident and Injuries.*

(10) Shortly before 5:30 p. m., on the afternoon of October 9, 1974, a 19 foot motor boat, traveling south along the Intracoastal Waterway, exited from Winyah Bay in Georgetown County, South Carolina, and proceeded in a southerly direction through the Estherville-Minim Creek Canal. John W. Fulton, a 31 year old real estate developer, and Carol Lynn Feaga, his 19 year old fiancee, were traveling from Ocean City, Maryland, to Vero Beach, Florida, to make arrangements for their upcoming honeymoon. They were to be married on November 2, 1974.

(11) The tide was falling, the water calm, visibility clear, the sun was at a 30° angle in the southwestern horizon, and the weather was balmy.

(12) As the Fulton boat approached milepost 410.6 of the Intracoastal Waterway, the cable ferry connecting South Island and the mainland was transporting a loaded pulpwood truck from the island to the mainland side. The lights on the ferry boat were flashing, thereby increasing the hazard created by the cable as such lights directed attention to the ferry boat. The loaded truck totally obscured the operator's view of Fulton's approaching boat. As he approached the ferry, Fulton was traveling between 25 and 35 miles per hour. Fulton, apparently seeing the ferry boat more than two-thirds the way across the canal, which channel was approximately three hundred feet wide, attempted to pass behind the ferry; he never slackened his speed, or veered from his course, and there is no evidence that he ever saw the slender guide cable stretched taut across the waterway behind the ferry.

(13) The bow cleat of Fulton's boat caught the cable, causing the bow to rise almost vertically out of the water. The cleat then tore off, and the boat fell forward into the water causing the guide cable to strike Fulton's forehead just above the eyes, severing the top of his head. Fulton died instantly. The unpiloted boat continued south approximately one hundred yards into the marsh bank on the island side. There rescuers found Feaga, unconscious and bleeding from her right ear, in the bottom of the boat.

(14) Feaga was transported from the scene by ambulance to the Georgetown Memorial Hospital, Georgetown, South Carolina, where she received emergency medical care. A diagnosis of basilar fracture of the skull was made and she was transported in a comatose condition to, and hospitalized at, the Medical University of South Carolina Hospital, in Charleston, South Carolina, for treatment of a concussion, laceration of the right mastoid area, right basilar skull fracture, draining blood from her right ear, and a fracture of the left index finger. Feaga remained disoriented for several days and on October 14, 1974, she was discharged and returned to her home in Maryland, where she received follow-up medical care for leakage of cerebral fluid and for her other injuries. As a result of the accident, Feaga sustained permanent damage to the nerve in her right ear causing tinnitus (ringing). For many months, she suffered from, and was treated by neurologists and other physicians for, persistent dizziness, loss of equilibrium, pain in her right ear and face, headaches, and distress. She has recovered from these symptoms, except for the constant tinnitus, which condition is aggravated by fatigue or stress, and which is accompanied by occasional dizziness and loss of equilibrium. The tinnitus can only be medically corrected by surgery of the tympanic nerve, which surgery would result in

complete loss of hearing in the right ear. Feaga has sustained some loss of hearing acuity but no functional loss of hearing. She still complains of some deformity and lack of suppleness in her left index finger, but no loss of function there has been shown, although there is a potential need for corrective surgery in the future.

(15) Fulton endured no pain and suffering before death; at the time of his death, he had no dependents; he was 31 years of age and had a life expectancy of 40.34 years. He enjoyed a loving family relationship with his parents, both of whom are elderly and in poor health, living within one hundred miles of them in Maryland, visiting them frequently, and regularly communicating with them via telephone.

## C. *Responsibility and Fault.*

(16) Fulton was an experienced boatsman; during his boyhood, his family owned a boat; he served four years in the United States Coast Guard; and he had owned the particular boat involved here for several years before the collision, using it on a regular basis, primarily in the Chesapeake Bay. Fulton was not familiar with the waters of the Estherville-Minim Creek Canal, but he did keep on board and consult up-to-date charts of the Inland Waterway System published by the United States Coast and Geodetic Survey. These charts carried the simple notation "Cable ferry." Fulton did not possess the government publication *Coast Pilot,* which contained the following warning: "A cable ferry crosses the Intracoastal Waterway at mile 411.5. The cable is suspended during crossings and is dropped when the ferry docks. DO NOT ATTEMPT TO PASS A MOVING CABLE FERRY." However, the court finds as a fact that possession and consultation of the *Coast Pilot* would probably have served to enhance the danger rather than minimize it. This is due to two gross misstatements in the "warning" contained in the *Coast Pilot's* last two sentences. The second sentence of the warning notes that the "cable . . . is dropped when the ferry docks." This is only partly true because when the ferry docks at the *mainland* side of its run to pick up or deposit vehicles, the cable *is not* dropped, *nor* can it be dropped until the ferry returns and docks on the island side. The last sentence of the "warning" only exacerbates the gross falsity of sentence two. By warning mariners not to "attempt to pass a moving cable ferry," the language clearly indicates that it is safe to pass a stationary or docked cable ferry; however, as pointed out above, a stationary cable ferry docked at the mainland side *cannot* be safely passed because the cable is still up, waiting to snare unwary boatsmen. The court thus finds that the alleged "warning" in the *Coast Pilot* is poorly written, completely fails to warn boatsmen, and constitutes an additional hazardous factor in the extreme danger faced by mariners traversing this portion of the waterway.

(17) Fulton operated his boat in a reasonable and prudent manner, and his conduct played *no role in causing* the collision. The passenger Feaga likewise conducted herself in a reasonable and prudent manner, and is not chargeable with any negligence or fault which contributed to the cause of the collision.

(18) The State Highway Department, having assumed the control and maintenance of the cable ferry, which this court has determined to be an unusually dangerous operation, failed to exercise due care in that it did not provide adequate or reasonable warning to boatsmen approaching the ferry. Such negligent conduct on the part of the State Highway Department was a proximate cause of the collision here involved.

(19) The United States had nothing to do with the ownership, operation or maintenance of the ferry. However, it knew of the ferry's existence. Coast Guard personnel used the ferry daily, and the Coast Guard commander or a member of his staff visited the ferry situs quarterly. Official government charts and publications contained notations about the ferry. The Army Corps of Engineers made periodic inspections of the area, and at trial, a Corps representative admitted a long-standing fa-

miliarity with both the area and the cable. The Corps and the Coast Guard, acting for the United States, knew or had reason to know that the ferry was a threat to navigation. In addition to recognizing the danger posed by the ferry—(although, as noted above, not appropriately warning against it)—in its publication, the *Coast Pilot*, the Coast Guard investigated three accidents involving the cable between 1971 and October 9, 1974. Concerned boaters wrote the Coast Guard complaining that the ferry was dangerous and needed more adequate warning signals.[1] At least one of these letters was forwarded to the Coast Guard office in Miami for "appropriate action." The Coast Guard, however, took no action. Furthermore, the Coast Guard office in Miami received copies of all the State accident reports, although there was some evidence that such information was used for statistical purposes only. Armed with all of this information obtained by the Coast Guard and the Corps, the United States did nothing to warn of, or improve the safety of the ferry operation, and such conduct constituted negligence, and a clear abuse of discretion, which conduct was a proximate cause of the collision between the cable and the boat.

(20) Based on the aforesaid findings, this court has concluded that the cable ferry as it existed on October 9, 1974, constituted an extremely dangerous trap to unwary boaters. Its macabre character is evident to all familiar with its operation. The warning signs and chart notations were insufficient to apprise a boater of the danger which he faced when the cable ferry was in use. As explained above, (Finding of Fact No. 16), even the "warning" in the *Coast Pilot* was an inducement to danger.

(21) In apportioning liability between the State Highway Department and the United States, the court has determined each to be fifty per cent (50%) at fault.

## CONCLUSIONS OF LAW

### A. *Jurisdiction.*

(1) This court has jurisdiction of this action under 28 U.S.C. § 1333. Plaintiff Feaga's action for personal injuries, occurring on the navigable waters of the United States, has the proper maritime nexus. *Whittington v. Sewer Construction Co., Inc.*, 541 F.2d 427 (4th Cir. 1976). The wrongful death action instituted here by plaintiff Doyle is appropriately brought under the general maritime law (*Moragne v. States Marine Lines*, 398 U.S. 375, 90 S.Ct. 1766, 26 L.Ed.2d 362 (1969)[2] and *Sea Land Services v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1973)). Additionally, the United States is a proper defendant by virtue of 46 U.S.C. § 742 (1975), [the Suits in Admiralty Act], whereby the United States may be sued in cases where, if a private person were involved, a proceeding in admiralty could be maintained.[3] Venue is properly laid, 46 U.S.C. § 742.

---

1. Letter of Charles DuBose to Coast Guard written after DuBose struck cable in April, 1971; letter of James F. Moss to Coast Guard, July, 1971; letter of James Flemming to Coast Guard in August, 1973, recommending additional safety measures.

2. This court notes that in *Moragne, supra*, the Supreme Court expressly left open the questions of the proper plaintiff and statutory beneficiaries in the federal common law maritime wrongful death cause of action it had just fashioned (398 U.S. at 406, 90 S.Ct. 1766). In other contexts, such a situation could lead to a serious question concerning proper beneficiaries due to the inconsistency among the federal statutes, as well as the states' wrongful death statutes. However, in this case, all possible statutes to which this court would look to determine the proper party-plaintiff and statutory

beneficiaries are in agreement that the personal representative of the decedent's estate is the proper person to institute the suit, and that the decedent's parents are the proper beneficiaries. *Compare* S.C.Code § 15–51–20 (1976), 46 U.S.C. § 761 [The Death on the High Seas Act], and 46 U.S.C. § 688 (1975) [The Jones Act], incorporating 45 U.S.C. § 51 (1972) [The Federal Employer's Liability Act]. For an indication of a situation where events might dictate considerable difficulty in ascertaining the proper classes of beneficiaries and their proportional benefits, *see, Gilmore and Black*, The Law of Admiralty, § 6–30 (1972). *See generally*, 2 Benedict on Admiralty, § 85 (1975).

3. The overwhelming weight of authority is that the statute applies even where the United States does not operate any vessel involved in

**B.** *Discretionary Function and The Suits in Admiralty Act.*

■ (2) The Suits in Admiralty Act contains no discretionary function exemption, and none is recognized in this Circuit. *Lane v. United States,* 529 F.2d 175 (4th Cir. 1975); *compare, Gercey v. United States,* 540 F.2d 536 (1st Cir. 1976). Thus, the failure of the United States to adequately mark the cable ferry in the instant case with sufficient warning is within the waiver effected by the Suits in Admiralty Act.

■ (3) Whether the United States' negligence arises from a uniquely governmental activity, such as marking obstructions and operating lighthouses, or from proprietary activities similar to those undertaken by private persons, such as operating motor vehicles on public highways, is of no consequence. The United States' liability does not depend upon the presence or absence of an identical private activity. *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955).

■ (4) 14 U.S.C. § 86 (Supp.1977) authorizes the Coast Guard to mark "any sunken vessels or other obstructions existing on the navigable waters of the United States." Prior to its amendment in 1965, this section referred only to marking "sunken vessels and other *similar* obstructions." (14 U.S.C. § 86 (1956)) (emphasis added). The legislative history to the amendment declares broadly, "This bill * * * provides that the primary obligation for marking *all* obstructions rests with the Coast Guard." (1965 *U.S.Code Cong. and Admin.News* p. 3140 (emphasis added). This amendment manifested a congressional purpose, in this court's opinion, to broaden the application of § 86 to include not only submerged obstructions, but surface obstructions other than vessels as well.

■ (5) The case of *Lane v. United States,* 529 F.2d 175 (4th Cir. 1975), holds that the Coast Guard has some discretion in deciding whether to mark an obstruction, but adopts the legal principle that the Coast Guard must exercise its discretion responsibly. (*Id.,* at 179). In the instant case, the Coast Guard failed to mark the cable itself while knowing such cable to constitute a real danger to navigation; this is not a responsible exercise of discretion.

■ (6) The United States argues that it has no aid to navigation with which to mark such a cable. This argument defies both logic and actual events. Initially, this court notes that the Coast Guard's own regulations define an aid to navigation as "any device * * * intended to * * * warn—[a navigator]—of dangers and obstructions to navigation." 33 C.F.R. § 60.-01–5 (1976). The Coast Guard, as evidenced by its actions after October 9, 1974, had the requisite authority to require the State Highway Department to properly warn the traveling public of the cable's danger.[4] (See, 14 U.S.C.A. §§ 1, 83 and 85 (Supp. 1977)). Additionally, the Coast Guard has undertaken regulation of private aids to navigation, including state maintained aids to navigation. (33 C.F.R. §§ 66.01–66.10 (1976)). These latter sections prohibit private or state aids to navigation without the approval of the Coast Guard and the authorization of the District Engineer.

■ (7) In the alternative, the United States insists that the notation in the *Coast Pilot* discharged its duty to the boating public. This court has previously—(Finding of Fact No. 16)—wholly rejected that contention. Additionally, the court notes that there is no statutory duty for a boatsman of Fulton's class to carry the *Coast Pilot;* (*See,* 46 U.S.C. § 526k (1958)); nor would general principles of safe boating require such action. *Cf. Lane v. United States,* 529 F.2d 175 (4th Cir. 1975). Likewise, it would

the collision. For a recent case collecting authorities, *see, The Yorkmar,* 1977 A.M.C. 805, 841 (D.Md.1977).

**4.** While evidence of a subsequent remedial measure is inadmissible to prove negligence, such evidence is admissible to show the feasibility of precautionary measures, where, as here, such feasibility is contested by the party against whom such evidence is offered. F.R. Evidence 407.

be out of step with the realities of modern boating to require all boaters to stop at every marina along the Intracoastal Waterway, as the United States seems to suggest, to check local conditions. A boater should be able to rely on a United States Coast and Geodetic Survey chart for accurate information and adequate warnings. If dangerous conditions exist, adequate warning should be placed on the chart or at the scene. An obscure misleading paragraph in the *Coast Pilot* is neither adequate nor responsible. When the United States knows of a hidden danger and undertakes to mark it—(on a chart or otherwise)—it is subject to liability, if the marking constitutes "a trap for the ignorant or unwary, rather than a warning of danger." *Somerset Seafood Co. v. United States*, 193 F.2d 631, 635 (4th Cir. 1951).

■ (8) The duty to warn arises from knowledge by the United States of the hidden danger and its statutory authority to implement corrective measures independently of the ownership, construction, maintenance or operation of the dangerous obstruction. As Mr. Justice Clarke wrote in *Chapman v. United States*, 541 F.2d 641, 645 (7th Cir. 1976):

> "The United States emphasizes that it did not own, construct, maintain or in any way operate the dam involved here; nor did it ever undertake 'a duty to mark the dam'. It begs the question posed here, i. e., did it owe the duty to mark the dam?"

(9) The State Highway Department acted equally as irresponsibly as did the United States. It was in daily control of the ferry and had first-hand knowledge of the previous accidents that had taken place; Nonetheless, it did nothing of substance to rectify the danger. Indeed, its only action in connection with the ferry (besides erecting the inadequate signs detailed in Finding of Fact No. 7) was to attempt to immunize itself from liability from what some prescient legislators must have realized was a liability time bomb waiting to explode. *See,* S.C.Code § 57–15–140 (1976).

### C. *Contribution and Credit.*

(1) In admiralty, joint tort-feasors normally have a right of contribution. *Cooper Stevedoring Co., Inc. v. Fritz Kopke, Inc.*, 417 U.S. 106, 109, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974). The State Highway Department and the United States were joint and equal tort-feasors in accordance with the previous apportionment of fault. (Finding of Fact No. 21). The State Highway Department has settled with the plaintiffs, and, accordingly, the plaintiffs cannot subject the Highway Department to any further liability. Additionally, the United States and the State of South Carolina, by dismissing their respective cross-claims with prejudice, have negated, in any event, any possible contribution from each other. *Muth v. Dechert, Price & Rhoads*, 391 F.Supp. 935, 939 (E.D.Pa.1975).

■ (11) Absent a settlement with one defendant, the liability of tort-feasors is joint and several, and the innocent plaintiff can recover his full damages from either tort-feasor. *Cooper Stevedoring, supra,* at 113, 94 S.Ct. 2174; *The Atlas,* 93 U.S. 302, 318, 23 L.Ed. 863 (1876); *Linehan v. United States Lines, Inc.,* 417 F.Supp. 678, 694 (D.Del.1976). Due to the settlement with the State Highway Department, each plaintiff is entitled to recover from the United States the full amount of his/her judgment, less a credit for an amount equal to the proportional fault of the State Highway Department. *Fruge v. Damson Drilling Co.,* 423 F.Supp. 1276 (W.D.La.1976).[5]

---

**5.** The subject of contribution between joint tort-feasors in the context of a settlement by one defendant with the plaintiff has sparked considerable debate. The two basic positions taken are:

(a) A settling defendant, who receives a release from the plaintiff which preserves the plaintiff's rights against a co-defendant, is liable for contribution—(in the absence of an agreement between defendants)—in an amount equal to his proportional fault, less the amount he has paid in settlement. Concomitantly, the recovery of the plaintiff against the non-settling defendant is reduced by the amount *actually paid* by the settling defendant. *See, Alexander & Baldwin, Inc. v. Peat, Marwick, Mitchell & Co.,* 385 F.Supp. 230 (S.D.N.Y.1974)

which aptly describes the situation which the "reduce by amount" rule creates:

"[T]he usual form of general release . . . will not prevent a plaintiff from suing a [non-settling] joint tort-feasor. If such a subsequent action were brought against the joint tort-feasor, then it is predictable that the party who thought he purchased his peace . . . will now find himself right back in the litigation as a third-party defendant. The consideration paid is non-refundable and may only be used as a partial affirmative defense in mitigation of plaintiff's damages." at 239. (explanation added)

The *Uniform Contribution Among Joint Tort-feasors Act* cited in *Gomes v. Brodhurst,* 394 F.2d 465 (3rd Cir. 1967), follows the "reduce by amount paid" rule in absence of a "pro rata reduction" stipulation expressed in the settlement agreement. *Cf. Simonsen v. Barlo Plastics Co., Inc.,* 551 F.2d 469 (1st Cir. 1977). [Denying non-settling co-defendant's right to contribution although reducing damages by amount actually paid.]

(b) A settling defendant who receives a release from the plaintiff preserving the plaintiff's rights against a non-settling co-defendant is not liable for contribution in any event. Concomitantly, the recovery by the plaintiff against the non-settling defendant is reduced by an amount attributable to the settling defendant's proportional fault. *Luke v. Signal Oil & Gas Co.,* 523 F.2d 1190 (5th Cir. 1975); *Griffin v. United States,* 500 F.2d 1059 (3rd Cir. 1974) [construing wording of release]; *Gomes v. Brodhurst,* 394 F.2d 465 (3rd Cir. 1967) [discussing several alternatives at page 468 before deciding]; *Fruge v. Damson Drilling Co.,* 423 F.Supp. 1276 (W.D.La.1976); *Leger v. Drilling Well Control, Inc.,* 69 F.R.D. 358 (W.D.La. 1976).

A *simple example will illustrate the opposing* positions. Assume plaintiff is in an accident with defendant (N) and defendant (S). Plaintiff, whose damages are $100,000.00, is not at fault, while the fault is apportioned at 40% to defendant (N) and 60% to defendant (S). Plaintiff settles with defendant (S) for $20,-000.00. Under theory (a) above, the recovery by the plaintiff against defendant (N) is reduced by the dollar amount—($20,000.00)—paid by defendant (S) in settlement. Thus, plaintiff can execute against defendant (N) for $80,000.00 and defendant (N)—(in the absence of an agreement such as a dismissal of cross claims with prejudice)—can cross claim for contribution against defendant (S) in the amount of $40,000.00 (i. e., $60,000.00 attributable to defendant (S)'s negligence less the amount paid by defendant (S) in settlement).

On the other hand, under theory (b), the plaintiff can recover from the defendant (N) only $40,000.00—(that is the total amount of plaintiff's damages ($100,000.00) reduced by an amount attributable to defendant (S)'s propor-tional fault ($60,000.00)). Since defendant (N) has had to pay only what he would be liable for due to his own negligence, he has no cross action against defendant (S). [Note that this court is not faced with the correlative question of whether a *settling* defendant, who, as events later reveal, has paid more than his share of the plaintiff's recovery can enforce contribution against the non-settling defendant. Such a situation would arise in the case above if defendant (S) was found to be anything less than 20% at fault. *See, Castillo Vda Perdomo v. Roger Construction Co.,* 418 F.Supp. 529 (E.D.Penn. 1976)].

It is clear from the cases that co-defendants can alter their liability for contribution by contract or other legal action, such as dismissal of a cross claim with prejudice. *See, United States v. Immordino,* 534 F.2d 1378 (10th Cir. 1976); *Muth v. Dechert, Price & Rhoads,* 391 F.Supp. 935, 939 (E.D.Pa.1975).

This court is of the opinion that the "reduce by proportional fault" theory commends itself particularly in admiralty jurisprudence with its comparative fault doctrine. Since the decisions in *Pope & Talbot, Inc. v. Hawn,* 346 U.S. 406, 409, 74 S.Ct. 202, 98 L.Ed. 143 (1953) and *United States v. Reliable Transfer Co., Inc.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), it has been settled law that a party to a maritime collision should bear only the proportional share of damages attributable to his fault. Under the "reduce by amount paid" theory, a non-settling defendant could end up paying more than *Reliable Transfer* dictates (such as here where the defendants have eliminated contribution by dismissing their cross claims with prejudice). The better rule, this court feels, is to respect the aleatory nature of the settlement process and to hold both the plaintiff and settling defendant to their gamble. The plaintiff gambles that the amount he receives in settlement plus the amount recoverable from the non-settling defendant will be greater than he could have recovered if he pursued both actions to judgment (i. e., the plaintiff hopes the settling defendant will pay more than what is eventually determined to be his proportional share of the damages). The settling defendant gambles that the amount he pays in settlement is less than he ultimately would be liable to pay, had he gone to judgment. To allow the plaintiff, to, in effect, "void" this bargain and execute against the non-settling defendant for the entire damage award less the amount actually paid in settlement, with a right of cross claim preserved against the settling defendant in favor of the non-settling defendant, runs contrary to logic and to the theory adopted by the Supreme Court in maritime collision cases. *United States v. Reliable Transfer, supra,* at 411, 95 S.Ct. 1708. On this topic generally, *see,* 18 Am.Jur.2d *Contribution* § 52 (1965).

The recent Fourth Circuit case of *Edmonds v. Compagnie Generale Transatlantique,* 558 F.2d 186 (4th Cir. 1977), rehearing *en banc* granted

June 3, 1977, provides analogous support for this court's decision to hold the United States liable only for its own negligence in using the "reduce by proportional fault" rule. In *Edmonds,* an injured longshoreman sued the vessel after receiving statutory benefits from his employer—(the stevedore)—under the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act of 1927, 33 U.S.C. § 901, et seq., (The Act). At trial, the negligence of the parties was divided as follows: longshoreman (10%); vessel (20%); and stevedore (70%). The district court allowed the longshoreman to recover his entire damages—(less 10% for his own negligence)—from the vessel even though the vessel was only 20% negligent. Under the Act, the longshoreman could not sue his employer-stevedore, nor could the vessel sue the employer-stevedore for contribution. On appeal, the Fourth Circuit Court of Appeals held that as a *quid pro quo* for allowing the longshoreman recovery against his employer-stevedore without having to prove negligence, the vessel should be liable only for its own negligence. This result, which differs from that reached in other circuits, *see, Shellman v. United States Lines,* 528 F.2d 675 (9th Cir. 1975), followed from reliance on the language and spirit of *Reliable Transfer, supra,* discussed above.

Juxtaposing, the present parties with the parties in *Edmonds,* an analogy can be seen which supports this court's conclusion. Consider the following:

| Edmonds | Fulton (at trial) |
| --- | --- |
| Longshoreman sues vessel | Fulton sues United States of America |
| Longshoreman cannot sue stevedore | Fulton cannot sue South Carolina |

In *Edmonds,* the longshoreman could not sue the stevedore because the statute, 33 U.S.C. §§ 904, 905(a), in effect "settled" his case against his employer and provided him with statutory compensation. In *Fulton,* the plaintiff in fact settled his case with the State of South Carolina. In *Edmonds,* the vessel could not sue the stevedore for contribution because the statute barred such action, 33 U.S.C. § 905(a), 558 F.2d at 191. In *Fulton,* the United States of America could not sue the State for contribution in any event because it had dismissed its cross claim with prejudice. Finally, in *Edmonds,* the longshoreman could sue the vessel for negligence, 33 U.S.C. § 905(b), not having settled with that defendant, while, in *Fulton,* the plaintiff likewise could sue the United States for negligence, not having settled with that defendant.

The Fourth Circuit reviewed the *Edmonds* situation and saw two results. First, the trade-off for denying the vessel its right of contribution against the stevedore is to hold the vessel for only its own negligence. Second, it held that the plaintiff is not substantially damaged because he swaps the possibility of a larger recovery against his employer for certain statutory compensation payments. Likewise, in the present suit, the plaintiff has traded the possibility of a larger recovery against the State of South Carolina for an immediate recovery, and while it is true here that the defendant-United States voluntarily dismissed its claim for contribution against the State of South Carolina, rather than, as in *Edmonds,* having such claims barred by statute, the same *quid pro quo* should be applied. While the longshoreman had no right to recover against the stevedore due to the statute, the plaintiff here had, at trial, no remaining right to recover against the State. Paraphrasing *Edmonds:*

".  .  . a concomitant of the stevedore's [state's] no-fault [settlement] liability is the exclusivity of the compensation [settlement] remedy against it. Thus, even as the longshoreman [plaintiff] receives a lesser recovery, he benefits .  .  . without having to prove fault on the part of anyone. As will be later apparent, he also benefits from the negligence of the vessel [United States of America], but only to the extent of its own fault." at 192.

An additional factor influences this court to adopt the "reduce by proportional fault" or "equitable credit rule" as it is called in *Edmonds.* After settlement with the plaintiffs, the State of South Carolina played no role in the trial which followed. As such, it could not cross-examine witnesses, produce evidence, or in any way attempt to influence this court's finding of proportional negligence. It would be wholly unfair to hold the State of South Carolina liable to pay 50% of plaintiff's damages either directly or indirectly (via contribution) when such defendant was unable to participate in the trial which established the percentages of negligence for each party. Although it certainly was not the case here, in other instances involving comparative negligence, an unscrupulous plaintiff and non-settling defendant could agree to shape the evidence at the trial so that the majority of fault was attributed to the settling defendant who could not defend himself. Such a situation might arise where the settling defendant had a "deeper pocket" than the non-settling defendant. This court feels that the bargain of the parties whereby the defendant State of South Carolina agreed to pay a fixed sum to the plaintiffs and not to defend the negligence action must be honored by all and the plaintiffs may recover from the United States only for percentage liability of the United States.

The District of Columbia Circuit has, in a series of decisions, considered the problems arising from joint tort-feasor settlements. In *Kassman v. American University,* 178 U.S.App.

(12) The elements of damages properly recoverable under the circumstances of this particular action for wrongful death are such loss of decedent's services and society as the beneficiaries, here the decedent's aged mother and father, have sustained, plus the expenses for the decedent's burial (*Sea Land Services v. Gaudet*, 414 U.S. 573, 584, 94 S.Ct. 806, 39 L.Ed.2d 9 (1973).

While the present rule in South Carolina uses the life expectancy of the decedent, rather than that of the beneficiaries to determine damages under the South Carolina Wrongful Death Statute, *Jones v. Dague*, 252 S.C. 261, 166 S.E.2d 99, 102 (1969), in the *Jones* decision, the South Carolina Supreme Court expressed some doubt about the continued validity of that principle, although due to a pleading technicality, the Supreme Court would not reconsider that issue. (*Id.* at 103). However, since this court is of the opinion that the South Carolina Supreme Court will not adhere to the *Jones v. Dague* holding in a future case, when the beneficiaries are older than the decedent, with that issue properly presented, this court does not feel bound to follow that rule. *Hood v. Dun & Bradstreet, Inc.*, 486 F.2d 25 (5th Cir. 1973), *reh. en banc denied*, 486 F.2d 34 (5th Cir. 1973).

Another fundamental reason that this court does not feel *"Erie*-bound" by

D.C. 263, 546 F.2d 1029 (1976), the court, while allowing the non-settling defendant a credit in the amount actually paid by the settling defendants, in the circumstances of that case, approved the "pro rata reduction" rule of *Martello v. Hawley*, 112 U.S.App.D.C. 129, 300 F.2d 721 (1962), in a similar situation where the settlement barred contribution between defendants, saying:

> "Where one tortfeasor would be entitled to compel contribution from another but for the plaintiff's settlement with that tortfeasor, *the plaintiff's judgment has been further reduced so that the non-settling tortfeasor pays no more than his pro rata share.* This means, of course, that the plaintiff does not receive full compensation for the injury as found by the jury, but that results from the plaintiff's decision to settle with one of the defendants, thereby depriving other litigating defendants of their right to contribution. See, *e. g., Brightheart v. McKay*, [136 U.S.App.D.C. 400, 420 F.2d 242 (1969)], *supra; Martello v. Hawley, supra.*" 546 F.2d at 1033, n. 24 (emphasis added).

*See also, Rose v. Associated Anesthesiologists*, 163 U.S.App.D.C. 246, 501 F.2d 806 (1974) [canvassing previous D.C. cases and aptly describing a partial settlement as a pro rata sale of plaintiff's lawsuit, at 250, 501 F.2d at 810, n. 10].

The Fourth Circuit case of *MacKethan v. Burrus, Cootes and Burrus*, 545 F.2d 1388 (4th Cir., 1976), *cert. den.,* —— U.S. ——, 98 S.Ct. 103, 54 L.Ed.2d 85, 1977, allowed a credit to the non-settling defendant of a portion of the dollar amount paid by the settling defendants, which had the effect of wiping out the non-settling defendant's obligation to the plaintiff. This case is distinguishable from the instant situation, however, because the court in *MacKethan* was unable to fashion a pro rata reduction award since the district judge's charge to the jury had, in the court's words, "precluded apportionment of blame between defendants" (*Id.* at 1389); also, the non-settling defendant in *MacKethan* was not charged as a principal, but as an aider and abettor of the principal's Rule 10b–5 violations. Thus, the Court of Appeals was faced with refusing to allow any credit—(as the district judge had done)—or allowing a dollar amount credit. The court could not, without remanding the complex litigation for a retrial, apportion fault among the nine defendants in the three actions there involved. The Fourth Circuit, in this set of circumstances, allowed the non-settling defendant a dollar amount credit, which ended its liability to the plaintiff. The case does not discuss the possibility of contribution among the defendants, but presumably the next step in that litigation would have been for the settling defendant to sue the non-settling defendant for contribution. Such contribution actions in federal securities cases involving intentional torts have been recognized in *Madigan, Inc. v. Goodman*, 498 F.2d 233, 238 (7th Cir. 1974), and *Globus v. Law Research Service, Inc.*, 442 F.2d 1346 (2nd Cir. 1971), and by implication in *Kassman v. American University*, 546 F.2d 1029, 1034 (D.C.Cir. 1976). The situation in the *MacKethan* case is similar to that in *Kassman v. American University, supra;* however, in circumstances when, as here, the settlement bars contribution, and when a proportionate division of fault can be made, such as in *Martello, supra,* this court feels that the rationale of *Edmonds v. Compagnie Generale Transatlantique*, 558 F.2d 186 (4th Cir. 1977), rehearing *en banc* granted June 3, 1977, (heard October, 1977), is persuasive, especially in the field of admiralty where the *Reliable Transfer* rule is involved, and it is this court's opinion that a non-settling tort-feasor should receive an equitable credit, or pro rata reduction.

the above stated rule is to be found in the Supremacy Clause of the United States Constitution (Art. VI, cl. 2). When the United States Supreme Court created a federal common law maritime wrongful death action in *Moragne v. States Marine Lines,* 398 U.S. 375, 90 S.Ct. 1766, 26 L.Ed.2d 362 (1969), it left the federal courts free to fashion the necessary elements of recovery, and that Court later gave guidance to the lower federal courts in *Sea Land Services v. Gaudet,* 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1973). The federal remedy has "pre-empted" the field, and this court does not believe that the state wrongful death remedy is still viable in maritime death actions. *Hamilton v. Canal Barge Co., Inc.,* 395 F.Supp. 978 (E.D.La.1975). Thus, while a federal court is free to look to relevant state wrongful death statutes for guidance, just as it may look for guidance to such relevant federal statutes, a federal court is not bound by the decisional state law and can wholly reject it. *Cf., Estate of Kauzlarich v. Exxon Co., U.S.A.,* 405 F.Supp. 332, 335 (D.S.C.1975). An example of this theory is found in *Gaudet, supra,* where the Supreme Court allowed recovery for wrongful death which resulted from personal injuries received during the decedent's lifetime, and for which injuries the decedent had recovered while alive. Noting that practically all state and federal wrongful death statutes barred such alleged double recovery, the United States Supreme Court held that a federal common law cause of action was not so barred under those circumstances.

■ Based on the life expectancy of the decedent's beneficiaries, both of whom are elderly and in ill health, and based on the aforesaid items of damage sustained by these beneficiaries, this court finds that the Administrator Doyle, is entitled to recover damages on behalf of such beneficiaries in the amount of One Hundred Forty-five Thousand and no/100 ($145,000.00) Dollars.

■ (13) The elements of damages properly recoverable in the *Feaga* personal injury action under the testimony presented here are such medical expenses as this plaintiff has incurred to date, and such pain and suffering as this plaintiff has endured to date and which she may reasonably be expected to endure in the future. The evidence does not indicate that the injuries suffered by the plaintiff have heretofore, or will in the future, affect her earning capacity, nor does such evidence establish any reasonable amount of likely future medical expenses. This plaintiff was 21 years of age at the time of the trial with a life expectancy of 49.5 years. Based on this factual situation and the evidence adduced at the trial, the court finds that she is entitled to recover the following damages:

(a) Hospital and medical expenses to date-$1,494.77

(b) Pain and suffering from the date of the accident until the date of trial-$10,000.00

(c) Future pain and suffering and discomfort, whether the same results from the existing tinnitus, or from an operation which will relieve the tinnitus but leave the plaintiff deaf in her injured ear-$54,633.00

TOTAL-$66,127.77

The damages for future pain and suffering have been computed by awarding the plaintiff $3,000.00 per year for her life expectancy of 49.5 years, or a total of $148,500.00, and reducing this amount to its present cash value by use of a discount rate of 5 per cent, which discount rate this court feels is reasonable and fair.

Based on the foregoing Findings of Fact and Conclusions of Law, it is

ORDERED, that judgment be entered in favor of the plaintiff, Patrick J. Doyle, Administrator of the Estate of John White Fulton, deceased, against the defendant, United States of America, in the sum of Seventy-two Thousand Five Hundred and no/100 ($72,500.00) Dollars.

IT IS FURTHER ORDERED, that judgment be entered in favor of the plaintiff, Carol Lynn Feaga, against the defendant, United States of America, in the sum of Thirty-three Thousand Sixty-three and 88/100 ($33,063.88) Dollars.

IT IS FURTHER ORDERED, that interest on the above judgments at the rate of 4 per cent per annum (46 U.S.C. § 743) run from the date of the filing of these lawsuits on October 9, 1975.[6]

AND IT IS SO ORDERED.

---

6. The allowance *vel non* of prejudgment interest in admiralty actions is a matter within the sound discretion of the trial court. *Gardner v. National Bulk Carriers, Inc.,* 221 F.Supp. 243, aff'd 333 F.2d 676 (4th Cir. 1964); *Reiss Steamship Co. v. United States Steel Corp.,* 427 F.2d 1152, 1153 (6th Cir. 1970); *Rosa v. Insurance Company of State of Pennsylvania,* 421 F.2d 390, 393 (9th Cir. 1970); *Circle Line Sightseeing Yachts v. Storbeck,* 325 F.2d 338 (2nd Cir. 1963).