### THE GILDERSLEEVE NO. 339.
### THE KATHRYN R. HICKEY.
### THE CLINTON.
### No. 143.

Circuit Court of Appeals, Second Circuit.
Jan. 29, 1934.

Rumsey & Morgan, of New York City (John Tilney Carpenter, of New York City, of counsel), for appellants.

Purdy & Purdy, of New York City (Edmund F. Lamb, of New York City, of counsel), for libelant-appellee.

Macklin, Brown, Lenahan & Speer, of New York City (Horace L. Cheyney, of New York City, of counsel), for Anthony O'Boyle, claimant of the scow Kathryn R. Hickey.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The libelant, as owner of the scow Gildersleeve No. 339, brought this suit in rem against the scow Hickey and the steam canal boat Clinton, to recover $12,000 damages for injuries to the Gildersleeve and for the loss of the personal effects of her master. The suit was also brought in personam against New York Canal & Great 'Lakes Corporation, owner of the Clinton, and against Munson Inland Water Lines, Inc., agent for such owner.

The charges against the Clinton, her owner and agent, are that, for the purpose of removing some other barges from a slip at the New York State Barge Canal Terminal in Brooklyn, she negligently shifted the Gildersleeve from a safe berth where she was lying to an unsafe berth where the Hickey, to which she was moored, careened over on her and did her serious damage; that the Clinton failed to return the Gildersleeve to the safe berth where she had been placed originally and where the Clinton had promised to take her, and failed to ascertain the condition of the new berth in which the Gildersleeve had been moored.

It is charged against the Hickey that the bargee of the latter was negligent in permitting her to be shifted to an unsafe berth and to be moored to the Gildersleeve in a place where she would settle down upon piles at low tide and damage the latter barge.

The District Judge held that the Hickey was seaworthy, had no knowledge that she had been placed in a dangerous berth, and was therefore free from fault. He held that the Clinton was negligent in not taking steps to ascertain that the berth to which the Hickey had been shifted was dangerous, and that it was unsafe to place the Gildersleeve where she would be moored next to the Hickey. He also apparently held that the Clinton shifted the Gildersleeve after a promise to return her to her old safe berth, and when the Gildersleeve was not returned, and suffered injury in the new berth, became in effect an insurer. As a result of the foregoing, the libel against the Hickey was dismissed and an interlocutory decree was granted against the Clinton, her owner and agent, from which this appeal has been taken.

The Gildersleeve was moored on the south side of the New York Barge Canal Terminal Pier, and the Hickey was the outermost barge in one of three tiers, of four barges each, that were moored across the slip from the pier at which the Gildersleeve lay. The Gildersleeve and the Hickey were so near together that they blocked the entrance to the slip against incoming or outgoing vessels. Nine steel barges lay further in the slip near the bulkhead. As the captain of the tug Clinton wished to tow them from the slip, he asked the bargee of the Hickey for permission to move her out of the way, and the latter consented on condition that the Clinton should replace her. He asked the bargee of the Gildersleeve for like permission, who acceded to his request on the same terms. Thereafter the Clinton shifted the Hickey to a berth alongside the coal dock and to the east of the tier of barges and placed the Gildersleeve outside of her. The Hickey made fast to the coal dock, and the Gildersleeve to the Hickey. It is argued that

the berth for each of these two barges was selected by her bargee and not by the tug, for the reason that the latter "floated" them into their respective berths. But, as the tug was the directing power and her crew facilitated the bargees in mooring, it may fairly be said that the tug selected each berth and that the District Court properly so found. The berth was apparently safe, for the three tiers of barges were lying along the coal dock next the very place at which the Hickey and the Gildersleeve were moored, and the nine steel barges, as well as others, lay further in the slip. It seems unlikely that a slip where such a large number of vessels had been moored would be an unsafe place to leave a barge.

When the tide fell, the Hickey began to list off-shore. Her bargee thought that she had grounded, but the cause of the listing was afterwards discovered to be some broken-off piles which stuck up from the bottom underneath the Hickey and caused the latter to settle and suffer a puncture in one of her planks. Finally, the Hickey listed so far over to port that she dumped her load and turned over, carrying under water the starboard side of the Gildersleeve which capsized and lay on top of the Hickey. The evidence showed that the Gildersleeve suffered serious damage, that her bargee lost his personal effects, and that his family barely escaped with their lives.

After the Hickey and Gildersleeve were moored at the coal dock, the Clinton took out the nine steel barges, but did not then shift back the Hickey or Gildersleeve to their original berths, or to others that were safe, but left them where they were, while she herself went to the south side of the State Terminal Pier to get some ice. Meanwhile the accident to the Gildersleeve happened. Neither the bargee of the Gildersleeve, nor another bargee temporarily in charge of her, requested the captain of the Clinton to shift her back to her former berth as soon as the steel barges had been towed out, and there was apparently no apprehension about her safety. No inquiries as to the safety of the berths in which the Hickey and the Gildersleeve were placed were made on the part of the Clinton or of the bargees themselves, and the bargees made no attempt to sound for depth of water. But, when the barges were shifted, a man on the dock, assuming to be the dockmaster and in charge of the premises, told the bargee of the Hickey to tie her up where he did.

■ The most that can be said about the failure of the tug to return the barges to their original berths is that she did not act promptly, but left the barges at the coal dock after she had towed the steel barges out of the slip while she went over to the north side of the barge canal pier to take on a load of ice. Those in charge of the barges had acceded to the shifting, seemed to be satisfied with the new berth, and made no complaint of the delay. This fell far short of a trespass on the part of the Clinton. Her liability, if any, must be founded on negligence. A mere abuse of the authority to leave the barges at the coal dock did not make the Clinton a trespasser. Six Carpenters' Case, 8 Coke 146a; Allen v. Crofoot, 5 Wend. 506; Beers v. McGinnis, 191 Mass. 279, 77 N. E. 768.

■ There was no lack of water in the new berth, and it was unsafe only because of the broken piles that stuck up two or three feet from the bottom at the place where the Hickey was moored. For fourteen days, the barge Moran lay safely in this slip just to the east of the Hickey's berth, and her bargee, who was a witness for libelant, said that he knew nothing wrong about the berth where the Hickey lay. We cannot think it negligent to place a barge in a slip constantly frequented by many other barges without inquiring whether its waters contained hidden dangers. The tug might have been bound to ascertain whether there was enough water in the slip for barges of the draft she was mooring, and would, of course, be chargeable with such information as harbor charts disclosed, but we think that she had a right to assume that a slip crowded with barges did not have such defects as broken piles in one berth when the adjacent berths were occupied by barges that lay in them safely.

In the Britannia, 213 F. 22, 24, we held a tug liable for mooring a barge at a small dock at Blackwell's Island where she grounded at low tide. The master of the tug knew there was doubt about the sufficiency of the depth of water and that the bottom was rocky. Judge Lacombe said in that case:

"We do not mean to hold that a tug captain is ordinarily under any obligation to take personal measurements to determine the draft of his tow, or to take personal soundings to ascertain the depth of water at a dock to which he is directed to go. But when he knows that there is probably no great margin of safety between the two, it seems to us that ordinary reasonable prudence would require him at least to ask the master of the tow how much water she drew, and to ask the person who directed him to tie up at a smaller dock than the one he was going to what depth of

water * * * was supposed to be there. The master of the Britannia did neither and for this failure under all the circumstances, to make even such a simple effort to ascertain if the berth was a safe one, on a falling tide, we think she should be held in fault."

Judge Lacombe added (at page 23 of 213 F.):

· "The case does not present a hidden defect about the dock such as a broken spile; apparently it was in proper condition to fulfill the service for which it was constructed."

In M. & J. Tracy v. Marks, Lissberger & Son, 283 F. 100, we declined to hold the consignee of a barge that had settled on a boulder and suffered damage in a berth which had been frequently and safely used and had a good repute. In the present case the safe use of the slip and the coal dock by many vessels justified the Clinton in assuming that the single berth that proved to have a hidden defect was as safe as other waters of the slip. The constant use of the slip for mooring barges showed good repute and the Clinton certainly ought to stand in as good a position as the lessees of the pier in Berwind Coal Mining Co. v. City of New York (C. C. A.) 48 F.(2d) 105, which had just acquired its lease and did not know of hidden obstructions to navigation which had existed prior to its occupancy.

We may add that the consent of the bargees to shift their vessels, though given, was not, in our opinion, necessary to justify the action of the Clinton. A rule that barges which block the entrance to a slip cannot be shifted without the owners' consent in order that other vessels may pass in and out would be impracticable. Relief from its rigor would require owners of such barges to have tugs at all times in readiness to shift them so that business in New York Harbor might not come to a standstill. Such a requirement would be burdensome and expensive. It would seem to be a reasonable rule that a tug may shift a barge to another convenient berth whenever she obstructs the course of navigation, and that such a barge must be regarded as occupying her berth subject to this right to shift, irrespective of whether her owner consents or not. The right must, however, be exercised with care and caution and only when reasonably necessary and for the purpose of temporary removal.

The decree is affirmed as to the Kathryn R. Hickey, and is reversed, with costs, as to the Clinton, her owner and agents, with directions to dismiss the libel as to them.