**Willard H. LANE, Appellee,**

v.

**UNITED STATES of America, Appellant.**

**No. 74–2169.**

United States Court of Appeals, Fourth Circuit.

Argued March 5, 1975.

Decided Nov. 25, 1975.

176

Alfred H. O. Boudreau, Jr., Atty., U. S. Dept. of Justice, Washington, D. C. (Carla A. Hills, Asst. Atty. Gen., New York City, David H. Hopkins, U. S. Atty., Norfolk, Va., and Morton Hollander, Atty., U. S. Dept. of Justice, Washington, D. C., on brief), for appellant.

Geoffrey F. Birkhead, Norfolk, Va. (Crenshaw, Ware & Johnson, Norfolk, Va., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, WIDENER, Circuit Judge, and HALL, District Judge.

HAYNSWORTH, Chief Judge:

In a suit in admiralty arising out of the collision of a cabin cruiser with a sunken barge, the district court concluded that the United States had violated a mandatory duty either to remove the wreck or to mark it and awarded damages to the vessel's owner. We think the 1965 amendments to one of the statutes makes the duty not mandatory but discretionary, but remand for consideration of the question whether failure to remove or mark the wreck was arbitrary and a violation of the discretionary duty.

Lane took a group of his friends in his 28 foot cabin cruiser for an outing on the North Landing River in Virginia. This is a part of the Intracoastal Waterway except that in the area new channels had been dug to bypass three loops

in the river's old course, with the effect of straightening and shortening the Intracoastal Waterway. At the northern mouth of one of these loops, on the western side of the Waterway, there was a sunken barge of which Lane was unaware.

Towing a skier, Lane had actually passed through this loop in a counterclockwise direction after which he proceeded northward in the main channel of the Waterway until he reached the mouth of the northern end of the loop. There, intending to make a clockwise turn while maintaining enough speed to keep the skier up, he made a slight preliminary turn to the left into the mouth of the loop. There he ran upon the sunken barge, because of which his cruiser sank a few minutes later.

There was testimony that the wrecked barge had been there for about five years, and that during each of those five years eight to ten boats had run upon it. There had been notices to and requests of the Army Corps of Engineers and the Coast Guard, but nothing had been done to remove or mark the wreck. After this incident, a marine surveyor, employed by Lane's insurer, requested both the Coast Guard and the Army Corps of Engineers to mark the wreck. He reported that each said the other was responsible. Eventually, however, some agency of the government did put up a marker.

I.

Prior to 1965, it was generally held that if the owner of a wrecked vessel in navigable waters where it would obstruct or endanger navigation did not remove it, the United States was required either to remove it or to mark it.[1]

This conclusion was based upon consideration of two Wreck Acts, 14 U.S.C.A. § 86, 33 U.S.C.A. §§ 409, 414 and 415.

■ 33 U.S.C.A. § 409 requires the owner of a vessel sunk in a navigable channel immediately to mark it and to commence its removal. The vessel will be treated as abandoned and subject to removal by the United States, if the owner fails to perform his duty of removal.[2]

The Secretary of the Army is authorized by § 414 to break up, remove, sell or otherwise dispose of a wreck after an abandonment has been established without any liability to the owner. Any money received from the sale or removal of any such wreck is to be paid into the Treasury of the United States. Section 414 applies only if the wreck obstructs or endangers navigation within navigable waters. Under § 415 the Secretary of the Army is authorized to act before an abandonment is established in emergency situations. The expense of any such emergency removal is made a charge upon the vessel and its cargo which, if not paid by the owner, may be collected by the United States out of the proceeds of the sale of the vessel and its cargo.

■ It is clear that §§ 409 and 414 of Title 33 do not require the Secretary of the Army to remove every abandoned wreck in navigable waters. Nor is there in these sections any explicit requirement that the wreck be marked pending removal, but such a requirement might be inferred, for an abandonment casts upon the United States all the incidents of ownership. The owner's duty to mark the wreck ends with its abandonment to the United States, at least if the sinking was accidental, but the necessity of

---

1. *Somerset Seafood Co. v. United States*, 4th Cir., 193 F.2d 631; *Jones Towing Inc. v. United States*, D.C.E.D.La., 277 F.Supp. 839; *Cornell Steamboat Co. v. United States*, D.C.S.D. N.Y., 138 F.Supp. 16; *Humble Oil & Refining Co. v. Tug Crochet*, 5th Cir., 422 F.2d 602.

2. If the vessel is sunk intentionally or negligently, the owner may remain subject to personal liability to the United States for the cost

of removal. *Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407. The owner of a vessel sunk accidentally, without fault attributable to him, is subject to no personal liability after abandonment.

marking is not altered by the abandonment.

Until 1965, however, there was a companion section which clearly provided for marking by the United States pending removal of the vessel. Title 14 U.S.C.A. § 86 authorized the Coast Guard to mark any such wreck, if the owner was in default in his duty suitably to mark the wreck before abandonment. The Coast Guard could charge the owner for the cost of its work. When an abandonment of any such wreck was established, § 86 charged the Secretary of the Army with the duty of keeping the wreck marked pending its removal, but the Coast Guard was authorized to act for the Army at the Army's expense. The mandatory language in § 86, in combination with §§ 409 and 414 of Title 33, made it clear that if the owner failed to discharge his duty to mark and remove, either the Coast Guard or the Secretary of the Army was charged with the duty of marking and the Secretary of the Army was authorized to remove the wreck.

In 1965, however, § 86 of Title 14 was amended to provide that the Secretary of the Treasury[3] may mark any sunken vessel for the protection of navigation "in such manner and for so long as, in his judgment, the needs of maritime navigation require." The section then provides for the liability of the owner for the cost of such marking until abandonment is established.

The 1965 amendment to § 86 was enacted after a representation of the Secretary of the Treasury that the Secretary of the Army construed old § 86 as not authorizing the marking of a wreck after a decision by the Army not to remove it. For that reason, authorization to some agency to mark wrecks and similar obstructions which were not to be removed was needed, so the Congress was informed. It was also suggested that it was desirable to eliminate the dual responsibility of the Army and the Coast Guard. Thus the amended section places the duty of marking entirely upon the Coast Guard.[4]

Under the old § 86, the Secretary of the Army was charged with the duty of marking such wrecks after abandonment "pending removal," a duty which we would suppose would continue after a decision that removal of the wreck would not be undertaken, for a decision to undertake removal or not has little to do with the need of marking. "Pending removal," we should have thought, meant what it said, and not pending a decision whether or not to remove, but the Congress acted on the representation of a want of authority to mark after a decision not to remove and in doing so, placed the whole matter of marking in the discretion of the Secretary of the Treasury, acting through the Coast Guard.

At the same time, it seems apparent from the brief legislative history that the 1965 amendment was not adopted with any conscious intention of relaxing the marking requirements. Some discretion in marking such wrecks is appropriate, of course. If one is in shallow water and is self-evident, there may be no need of any marking, but the legislative history surely does not indicate a congressional intention that the Coast Guard should be free of any duty to mark submerged wrecks which constitute hazards to vessels in navigation.

■ Whatever the Congress thought it was doing, we conclude that we cannot disregard the plain language of amended § 86. No longer can it be said that the United States has a mandatory duty to mark every unremoved wreck in navigable waters. In holding that it was a mandatory duty, we think the district

---

3. In 1966 the Coast Guard was transferred to the Department of Transportation, and the Secretary of that Department now has this authority.

4. The Senate Report took no notice of the stated problem of maintaining markers after decisions to leave wrecks where they were. The members were informed that the Bill related only to a transfer of functions and not of their enlargement. Sen.Rep.No.688, 89th Cong., 1st Sess., 1965 U.S.Code Cong. & Admin.News, p. 3140.

court was wrong, for the amendment of § 86 altered the scene.

The statute, however, is readily susceptible to a construction that the Secretary of Transportation, acting through the Coast Guard, is to exercise his discretion responsibly. He is not to ignore submerged wrecks of which he is informed, or fail to mark them if they constitute real dangers to navigation.

Under the Tort Claims Act, there is a "discretionary function" exception,[5] so that under the Tort Claims Act the United States is not liable for the consequences of misjudgment or inaction of officials having discretionary functions, for the statute makes the exception applicable "whether or not the discretion involved be abused."

■ This action, however, is brought not under the Tort Claims Act but under the Suits in Admiralty Act. 46 U.S.C.A. § 742 was amended in 1960 to subject the United States to libels in personam, not just when a government owned vessel or cargo was involved but in every situation in which, if a private person were involved, a proceeding in admiralty could be maintained. It contains no discretionary function exception, and the Tort Claims Act contains a specific exception of claims for which the Suits in Admiralty Act provides a remedy.[6] Thus it is clear that this action could not have been brought under the Tort Claims Act, and it is properly maintainable under the Suits in Admiralty Act, which is an effective waiver of sovereign immunity.[7]

There is no basis upon which we can import the many exceptions in the Tort Claims Act into the Suits in Admiralty Act, where the United States is to be held accountable in admiralty whenever a private person, in similar circumstances, would be.

■ It is clear that private owners do have a responsibility for marking their sunken vessels. That responsibility can be terminated by abandonment if the sinking was accidental. The Coast Guard may perform the private owner's duty for him if he neglects it or performs it inadequately and, upon abandonment, the sole responsibility for marking is cast upon the Coast Guard. If that duty is not co-extensive with that of the owner before abandonment, it, at least, requires care and prudence to mark submerged wrecks which constitute substantial hazards to navigation.

## II.

■ Title 33 § 409, which imposes the duty of marking upon private owners, refers to vessels sunk in navigable channels. But this has not been construed to confine the Act to the dredged, buoy marked channels to which commercial vessels are largely confined. This we clearly held in applying § 409 to a sunken drydock outside the channel leading to Baltimore Harbor.[8] The sunken barge here, of course, was not within the dredged, marked portion of the Intracoastal Waterway. It was in the mouth of the old channel of the river where the chart indicates a depth of approximately 16 feet. That these waters were used by pleasure craft is indicated by the testimony of many others foundering upon this sunken barge.

## III.

■ The United States contends that its duty to mark this sunken barge was

---

5. 28 U.S.C.A. § 2680(a).

6. 28 U.S.C.A. § 2680(d).

7. *Roberts v. United States*, 9th Cir., 498 F.2d 520, 525; *De Bardeleben Marine Corp. v. United States*, 5th Cir., 451 F.2d 140; *Richmond Marine Panama, S. A. v. United States*, S.D. N.Y., 350 F.Supp. 1210.

8. *See United States v. Bethlehem Steel Co.*, D.C.Md., 235 F.Supp. 569, reversed (4 Cir.) 374 F.2d 656, vacated 389 U.S. 575, 88 S.Ct. 689, 19 L.Ed.2d 775, on remand (4 Cir.) 409 F.2d 961. *See also Jones Towing, Inc. v. U. S.*, D.C.La., 277 F.Supp. 839; *Reading Co. v. Pope & Talbot, Inc.*, D.C.E.D.Pa., 192 F.Supp. 663; *Red Star Towing & Transportation Co. v. Woodburn*, 2nd Cir., 18 F.2d 77.

satisfied when the National Oceanic and Atmospheric Administration in the Department of Commerce published a chart with a wreck symbol on it at or near the location of the sunken barge.[9] We find no substance in the contention. It is quite clear to us that both of the Wreck Acts contemplate physical markings on the scene, and such duty as the Coast Guard has to mark wrecks hazardous to navigation is not discharged by the publication by the Department of Commerce of a chart.

## IV.

■■■■ Finally, the United States contends that Lane was contributorily negligent because he did not have with him and had not consulted the chart which had the wreck symbol on it. In some circumstances, particularly when large vessels are involved, the failure to have and to use current charts may be so obviously negligent as to require a finding to that effect.[10] Circumstances are important, however, and consideration must be given to such things as the size of the vessel, its draft, the navigator's experience, his general familiarity with the waters, and his handling of the vessel.[11] In a similar situation we held that experienced navigators of small boats, familiar with the waters, were not bound to notice information published in notices of the United States Lighthouse Service. *United States v. Travis*, 4th Cir., 165 F.2d 546, 548.

The district court found that Lane was not contributorily negligent. He testified that he was familiar with these waters, though that familiarity turned out to be less complete than he had supposed. Under all of the circumstances, however, we cannot say that the district court's finding that he was not negligent was clearly erroneous.

## V.

■■ In *Crosson v. Vance*, 4th Cir., 484 F.2d 840, we held that a claim of damages for personal injury by a water skier against the operator of the tow boat was without the admiralty jurisdiction. More recently, however, we have held that other controversies arising out of other mishaps to small pleasure craft in navigable waters are within the admiralty jurisdiction. *Richards v. Blake Builders Supply, Inc.*, 4th Cir., 528 F.2d 745 (decided Nov. 10, 1975). Here Lane was towing a skier, but collisions between vessels in navigation and submerged hulks of wrecked vessels are a traditional concern of admiralty.

## VI.

The case will be remanded to the district court for further consideration and a determination whether or not the failure to mark the sunken barge was an abuse of the discretionary authority to mark sunken wrecks under § 86.

*Remanded.*

---

9. There was some dispute as to the accuracy of the location of the symbol.

10. See *The Gildersleeve No. 339*, 2d Cir., 68 F.2d 845, 847; *Thornton v. United States*, S.D. Miss., 236 F.Supp. 651, 653; *See also De Bardeleban Marine Corp. v. United States*, 5th Cir., 451 F.2d 140, 148–49.

11. See, e. g. *Protection Maritime Insurance Co., Ltd. v. United States*, W.D.Ky., 368 F.Supp. 690, aff'd, 6th Cir., 496 F.2d 4; *McMilin v. United States*, D.Del., 290 F.Supp. 351, 355; *Beeler v. United States*, W.D.Pa., 256 F.Supp. 771.