Thomas Edward WHITMIRE, Individually and as father of the minors, Douglas Edward Whitmire, a minor, by his father and natural guardian, Thomas Edward Whitmire; David Lee Whitmire, a minor, by his father and natural guardian Thomas Edward Whitmire

v.

UNITED STATES of America.

No. 79–8084–Civ.–NCR.

United States District Court,
S. D. Florida,
Ft. Lauderdale Division.

June 30, 1980.

Arthur Roth, Miami, Fla., for plaintiff.

Richard A. Marshall, Jr., Asst. U. S. Atty., Miami, Fla., for defendant.

ROETTGER, District Judge.

Plaintiff has been a commercial fisherman for 20 years and started fishing on Lake Okeechobee about 1970. With the lake lighted by a full moon on November 26, 1977, plaintiff struck an unlighted, unmarked and unauthorized piling while returning with his sons from laying out a two-mile set of trot lines. Plaintiff's 18 foot Skipjack plywood boat with a 55 h.p. motor was making 30 knots and riding on the plane when it hit the piling. Plaintiff sued under the Suits in Admiralty Act, 46 U.S.C.A. § 741, et seq., for damage to his boat and injuries to himself and his sons.

Lake Okeechobee commercial fishermen customarily set out their trot lines in late afternoon—at "first dark"—for catfish. On this particular evening plaintiff and his sons left port a little later than usual. He followed his usual procedure that night and went east from the northeast corner of Observation Shoal, a low, uninhabited island, until he passed the northernmost of a line of pilings, the pilings lying approximately parallel to the eastern edge of Observation Shoal. At that point he could line up all of the pilings in a straight line. Then he proceeded a quarter of a mile further east and turned south to begin laying out his trot line.[1]

After completing the laying of the trot line plaintiff turned west and headed directly for Observation Shoal. He could see the lights of Sarasota Landing on the hori-

---

1. To assist him in laying out his trot line plaintiff uses a "headlight", similar to a miner's headlamp. It is powered by a 6-volt battery but he does not use it for navigational purposes although it provides 100 yards of visibility if the battery is good.

zon and planned to take advantage of the navigational aid provided by the 4-feet-high bull rushes at the east edge of the shoal. After clearing the line of pilings, he would turn when he saw the bull rushes and run north along the east edge of the shoal back to the channel; then he would turn west to return to the dock.

Plaintiff passed a piling on his port hand and thought he was proceeding west toward the bull rushes so he turned to starboard, intending to go north. Unfortunately, the boat was not going due west when he passed the piling and shortly after seeing the first piling he hit what apparently was the next piling in the line. The piling holed the hull of the boat and the boat spun around on the piling like a pinwheel. David Whitmire, the 13-year-old older son, was thrown out of the boat and the younger son, Douglas, eventually managed to shut off the engine. The three plaintiffs lay in the half-filled boat with their heads barely out of the water through most of the night. Two duck hunters rescued them toward morning and a fellow-fisherman later retrieved them from the duck hunters' metal jon boat.

## THE PILINGS

The piling was one of a string of pilings about 500 yards apart which had been erected by a dredging company between 1931 and 1933. The dredging company, Spadara, had a contract with the Corps of Engineers to construct the Okeechobee levee, popularly known as the Herbert Hoover Dike, on the west side of the lake. The levee was for the protection of residents after the disastrous loss of life during the 1928 hurricane. To construct the levee, Spadara dredged a channel south of Fisheating Bay.

The pilings were erected to protect Spadara's supply boats from running aground on Observation Shoal, which at that time had no vegetation on it. The pilings run parallel to the eastern edge of Observation Shoal and are located about 400–500 yards offshore.

The pilings are about eight inches in diameter and of varying heights above the water. Apparently, two were broken off while the others were visible from 18 inches to 6 feet above water. The wave action on the water's surface erodes the piling similarly to a beaver's tree-felling design. The water level varies in Lake Okeechobee depending on the season of the year and is higher during the rainy season.

The Corps of Engineers maintains the navigational aids for Lake Okeechobee; it also maintains an eight-feet-deep channel from Port Mayaca southwestward across the Lake and a six-feet-deep channel along the south side of Lake Okeechobee to Clewiston from where it proceeds to Moore Haven and the Okeechobee Waterway.

A retired maintenance foreman of the Rivers and Harbors section at the Corps of Engineers testified he discussed the broken pilings, which he considered "hazardous to navigation", with two supervisors but never discussed the matter with the area engineer. Apparently there was a continuing lack of sufficient appropriations for snag removal. Testimony revealed there are pilings all over the lake because 30 years ago commercial fishermen built platforms on pilings in order to clean their fish and the pilings have remained. The maintenance manager of the navigable waterways for the Clewiston office of the Corps made a study and report on the obstacles in the Lake. The report went to a higher authority in the Corps of Engineers; however, at a higher level it was decided clearing them wasn't feasible. There were no complaints received by the Corps of Engineers about the pilings.

In recent years red fluorescent markers were put on a few pilings near a reef north of Clewiston but nothing had ever been done east of Observation Shoal.

The Chief Engineer of the Jacksonville office of the Corps of Engineers testified that the Corps of Engineers has only $300,000 authorized for emergency snag removal and a snag boat cost $2500 to $3000 per day for operation. He acknowledged that today a contractor, such as the one who installed

the pilings nearly a half-century ago, would be required to remove the pilings; the Corps' contracts are different in 1980 than they were in 1930 even though the Corps still operates under the River and Harbors Appropriation Act of 1899, C. 425, § 9 et seq., 30 Stat. 1151, 33 U.S.C. § 401 et seq.

The trial was bifurcated and only the issue of liability was tried before the court without a jury.

## CONCLUSIONS OF LAW

Jurisdiction over this claim is based on the Suits in Admiralty Act, 46 U.S.C.A. § 741, et seq.; 28 U.S.C.A. §§ 1331, 1333. The relevant section of Title 46 provides that, "In cases where if . . . a private person or property were involved, a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United States . . .." 46 U.S.C.A. § 742. A number of courts have held that jurisdiction exists under this section in cases brought against the government where vessels have struck submerged wrecks and other obstructions. *Canadian Pacific (Bermuda) Limited v. United States*, 534 F.2d 1165 (5th Cir. 1976); *De Bardeleben Marine Corp. v. United States*, 451 F.2d 140 (5th Cir. 1971); *Chute v. United States*, 610 F.2d 7 (1st Cir. 1979); *Lane v. United States*, 529 F.2d 175 (4th Cir. 1975); *Offshore Transportation Corp. v. United States*, 465 F.Supp. 976 (E.D.La.1979); *McMilin v. United States*, 290 F.Supp. 351 (D.Del.1968); *Thornton v. United States*, 236 F.Supp. 651 (S.D.Miss. 1964). Section 742 waives any sovereign immunity from this suit which the government otherwise may have enjoyed. *De Bardeleben, supra* at 145.

The crucial issue in this case is whether the government breached its discretionary duty of due care to the users of Lake Okeechobee either to remove or mark adequately the pilings which plaintiff's boat struck.

As analyzed by the First Circuit in *Chute, supra,* there appear to be several possible bases upon which to impose a duty on the government to clear navigable waters of hazardous obstructions or to mark those

hazards. If this case involved a sunken or wrecked vessel, 33 U.S.C. § 409 would explicitly obligate its owner to mark it until it is removed. Failure to do so constitutes abandonment by the owner to the United States and subjects the wreck to removal by the government. Even if it is assumed that the pilings in this case are to be treated similarly to sunken wrecks, it is settled that any duty on the government to remove those pilings is discretionary, not mandatory. "Section 409 only supplies the statutory authority under which the Secretary *may remove in his discretion* when the owner has failed to do so." (emphasis added) *Buffalo Bayou Transportation Co. v. United States*, 375 F.2d 675, 677 (5th Cir. 1967).

Likewise, it is settled law that any duty on the government to mark hazards to navigation is also discretionary. The relevant statute, 14 U.S.C.A. § 86 provides in pertinent part:

The Secretary *may mark* for the protection of navigation any sunken vessel or other obstruction existing on the navigable waters . . . in such manner and for so long as, *in his judgment*, the needs of maritime navigation require. (emphasis added)

Several courts have held the statute's plain language imposes only a discretionary duty. *Chute, supra; Lane, supra; Offshore Transportation Co., supra.*

Plaintiff has attempted to impose a duty on the government because it both knew the pilings existed and knew of their dangerous condition.

The evidence was clear that the government never attempted to mark or remove the pilings. It never took any action which could have served to induce boaters or fishermen into relying on the government's actions. Thus, the doctrine of liability enunciated in *Indian Towing v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) is inapplicable.

In *Chapman v. United States*, 541 F.2d 641 (7th Cir. 1976) the government was held liable for a wrongful death caused by its failure to warn of a submerged dam in the

Kankakee River which constituted a hazard to navigation. In rejecting an argument that the government owed no duty to mark the dam, the court considered the government's prior involvement in the dam project together with the river's popularity as a recreation spot and considered it both "untenable and unseemly" that no duty be imposed on the government.

The court in *Lane v. United States*, 529 F.2d 175 (4th Cir. 1975) dealt with the breadth of the government's duty to mark a submerged wreck. The government contended that its duty was discharged when the National Oceanic and Atmospheric Administration noted the wreck on a chart. The court held that chart notations did not discharge the government's duty, and remanded the matter to the district court to determine if the failure to mark was an abuse of discretion.

In a slightly different set of facts, the Fifth Circuit held the government was under no duty to continually dredge or to conduct sounding surveys to discover if the St. Johns River was shoaling in certain places. *Canadian Pacific (Bermuda) Ltd. v. United States*, 534 F.2d 1165 (5th Cir. 1976).

Finally, the court notes *Blanksten v. United States*, 236 F.Supp. 280 (N.D.Ill. 1964) and *Thornton v. United States*, 236 F.Supp. 651 (S.D.Miss.1964) where it was held that the government had no duty to mark or remove submerged structures over which the government exercised no authority or control.

From the history of the pilings it is obvious that the United States neither constructed nor exercised authority over them. The pilings were erected by Spadara Co., a government contractor. However negligent Spadara might have been, that negligence cannot be imputed to the United States. There is no evidence that the government had, or exercised, any control over Spadara's handling of the threat to its barges posed by Observation Shoal. *Logue v. United States*, 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973). In fact, the erection of the pilings was not even a foreseeable or necessary step in the construction of the dike.

Having considered all of the cases mentioned above, the court must conclude that the government had only a discretionary duty to warn about, or remove, the pilings, and that it did not abuse its discretion and breach that duty.

The court reaches this conclusion for several reasons. First, this case is clearly distinguishable from *Chapman* in that there was no great amount of governmental participation in a project which later turned into a widely used recreation area. Second, the Secretary of Transportation, through the Corps of Engineers, was severely limited in its snag removal capabilities by budget constraints. This was considered as a valid factor in *Canadian Pacific, supra,* where the Fifth Circuit held that the Corps of Engineers was not a guarantor or insuror of the navigability of the St. Johns River. Third, in assigning priorities to snag removal projects, the Corps was validly exercising the very discretion granted to it by Congress. It can hardly be said the valid use of legally granted discretion constitutes an abuse of discretion. *Offshore Transportation Corp., supra.* Fourth, there was no evidence of prior accidents or requests for safety markings. *Compare, Lane, supra.* Fifth, these pilings did not constitute any sort of trap for the unwary. *Doyle v. United States*, 441 F.Supp. 701 (D.S.C.1977). They had been there for a long time and had been erected in a straight line. All persons familiar with the area knew that the pilings existed. Also, because they were installed in a straight row, the court feels boaters, using due care, would cautiously approach any interruptions in the line. In fact, plaintiff previously, as well as on the evening in question, clearly used the pilings as a navigational aid in determining where to begin laying his lines and was using the pilings as a navigational aid in returning to port.

The fact that plaintiff failed to cross the line of pilings on the correct course, or may have approached too fast, deals with plaintiff's own negligence. However, in view of this court's conclusion as to liability it is

unnecessary to consider the question of contributory negligence.[2]

Accordingly, it is hereby

ORDERED AND ADJUDGED that judgment be entered in favor of defendant.

---

2. The court feels constrained to compliment the candor—clearly their daily mode—of plaintiff, his son, and friends. Such forthrightness is always refreshing.