**EAZOR EXPRESS, INC., Plaintiff,**

v.

**UNITED STATES of America, John O. Marsh, Jr., Secretary, Dept. of the Army, United States Army Corps of Engineers, Lt. Gen. Joseph K. Bratton, Commander, U.S. Army Corps of Engineers, Defendants.**

**No. 81 CV 3796 (ERN).**

United States District Court, E.D. New York.

June 17, 1985.

See also 483 F.Supp. 138.

Manion Alder & Cohen by Joseph F. Mc-Donough, Richard R. Nelson II, Pittsburgh, Pa., for plaintiff.

Janis G. Schulmeisters, Atty. in Charge, Torts Branch, Civ. Div., U.S. Dept. of Justice by Marie Louise Hagen, Trial Atty., New York City, for defendants.

## MEMORANDUM OF DECISION AND ORDER

NEAHER, District Judge.

Plaintiff Eazor Express, Inc. ("Eazor"), a Pennsylvania corporation engaged in interstate trucking, commenced this maritime tort action for damages against the United States. Invoking the Extension of Admiralty Act ("EAA") and the Suits in Admiralty Act ("SIAA"), 46 U.S.C. §§ 740, 741–752 (1976), Eazor claims that the Army Corps of Engineers ("ACE") had negligently permitted an independent dredging contractor to remove lateral support from bulkheads, which supported Eazor's trucking terminal property bordering a portion of Newtown Creek in this District. Eazor subsequently sold the property, reserving the right to pursue its claim.

The following facts are not in dispute. ACE is a unit of the Department of the Army which is charged with, among other functions, maintaining navigable channels in waterways under its jurisdiction. Newtown Creek is such a navigable waterway originating in the Maspeth section of the Borough of Queens and ultimately entering into the East River. Pursuant to the Rivers and Harbor Act of 1917, ACE is authorized to maintain a 125 foot wide channel in Newtown Creek to a depth of 20 feet below mean low water. Based upon its knowledge of user traffic, however, ACE has generally sought to maintain a 16 foot channel depth in the East Branch of the Creek, the portion relevant to this controversy.

Newtown Creek serves a highly industrialized area which creates heavy waterborne traffic by scows, barges, tugs and the like carrying petroleum, scrap metals and other industrial products. To maintain a clear channel for that traffic, ACE performed soundings from time to time to determine whether shoaling, i.e., the deposit of sedimentation from the sloping sides of the Creek, had raised the 16 foot channel level. ACE had prior experience with that problem, which required dredging in 1958 and again in 1964 to restore the channel to the desired 16 foot depth. Confronted with the shoaling problem in 1974, ACE concluded that dredging was again necessary. Pursuant to standard government practice, bids were advertised for the dredging operation to be performed by an independent contractor. The low bidder was Weeks Dredging & Contracting Co., Inc. ("Weeks"), which was awarded the contract after ACE determined from past experience that Weeks was capable of performing the job from a technical standpoint.

Weeks commenced dredging in the East Branch on April 8, 1974 and proceeded continuously until completion on April 17. Weeks' daily reports of the dredger's progress were submitted to ACE for review in groups of 2, 3 or 4 days. Post-dredging soundings by ACE indicated that Weeks had removed 36,558 cubic yards of material. Weeks, however, received payment for only 32,127 yards pursuant to the government's standard contract requirements. The nonpayment for the excess of 4,431 cubic yards removed was in effect a penalty intended to discourage contractors from dredging more than was necessary and claiming extra compensation. It had nothing to do with any claim of wrongful performance by Weeks.

*Eazor's Claim*

In 1966 Eazor purchased two parcels of vacant land in the Maspeth area bordering the East Branch of Newtown Creek for a total cost of $625,052. A contemporaneous survey reflected that the area of the tract was 182,448 square feet, of which 3,842 square feet lay between the deed line and the U.S. Pier and Bulkhead line, and 2,568 square feet was land under water, leaving a net area above water of 176,038 square feet. PX 2. On this combined tract Eazor constructed a 75 door trucking terminal, outbuildings and a 410 foot riprap bulkhead along one side of the property, all of which were completed in November 1967. The combined cost of land and construction was $1,245,238.

Eazor utilized the terminal until August 6, 1973, when it leased the entire property for a term of three years to United Parcel Service at a rental of $200,000 per year plus United's payment of yearly real estate taxes of $84,000. Eazor then leased a smaller facility in Maspeth to conduct operations in conjunction with its reopened terminals in New Jersey. After United's lease expired, Eazor used a part of its terminal from August 1976 until April 1982, when it shut down its general commodity business. In the interim Eazor leased 40 doors of its terminal to Roadway Express from December 1979 through April 1981 for a total rental of $198,425, with Eazor paying taxes and insurance. From October 1981 through May 1982 Eazor leased a 20 door portion of its terminal to Tose, Inc. for a total rent of $36,000. Throughout these lease and rental periods Eazor had its terminal up for sale, and on

December 29, 1982 De Francisci Machine Corporation agreed to purchase it for $1,150,000, some $95,000 less than Eazor's cost of construction. PX 47.

Eazor claims that after expiration of the United lease in 1976 it had sought without success to sell its Maspeth terminal, although there were six or eight potential purchasers who showed a serious interest in the property. Three of these brought in their own engineers to study an area of ground subsidence along the west and north sides of the terminal in the vicinity of the riprap bulkhead bordering Newtown Creek. According to Eazor, the engineers' findings regarding the subsidence dissuaded their clients from purchasing the terminal. Subsequently, an unnamed prospective contractor's remark that recent dredging of the Creek could have caused the subsidence, prompted Eazor to employ engineering consultants to investigate "the cause of the settlement problem." Tr. 45.

On June 25, 1976, Edmund Burke, a partner of Mueser, Rutledge, Wentworth & Johnson, consulting engineers, reported his opinion to Eazor after inspecting the site and reviewing records of channel soundings made available by ACE for the years 1970, 1973 and 1974. Based on such data, Burke prepared drawings of the underwater channel areas adjacent to Eazor's two bulkheads purporting to show the character of the ground fill under the subsidence areas and the depth of the channel after Weeks' dredging in April 1974. PX 25. It was Burke's opinion "that the recent substantial settlements in both areas was caused by sliding settlements on your property caused by the dredging in the adjacent channel." Id. at 3. Thereafter Eazor filed a claim against the United States claiming property damage in the amount of $1,405,000, although the applicable two-year statute of limitations had long expired. Eazor succeeded, however, in reviving the claim by virtue of Private Law 96–66 enacted by the Congress.

The credibility of Burke's opinion testimony and Eazor's claim is seriously impaired by documentary evidence that as early as July 1972 there were widespread cracks and ground settlement throughout Eazor's terminal, including especially the west riprap bulkhead area. As Burke then stated in his August 10, 1972 investigation report:

"The eight photographs show the west bulkhead, damage to the yard pavement, damage to and discontinuity of the building floor slab and settlement of the yard pavement adjacent to the building."

PX 49 at 2. The cause of those conditions in the area of the buildings was "the result of consolidation of the peat stratum ... due to the increased loading on the underlying compressible peat stratum." Id. at 4. However, as Burke stated in the 1972 report:

The cause of the pavement cracking and settlement of the yard area adjacent to the bulkhead along Newtown Creek is not readily apparent and may be difficult, at this time, to determine with any certainty. Any one or more of the following could contribute to the movement that has taken place:

1. All silt or peat above the lower sand stratum was not completely removed before placing the riprap for the bulkhead.

2. The trench through the silt and peat was not excavated to sufficient width to provide a stable base for the riprap.

3. Fill material placed behind the bulkhead is being washed out through the voids between the large pieces used for riprap. We can find no requirement for a filter course behind the bulkhead to properly retain this fill.

Id. at 5.

Noting that the pavement cracks "are as much as 10 inches wide" and of "20 foot width", Burke concluded that "it appears there is lateral movement of the bulkhead as well as general settlement." Id. "To gain more knowledge", he recommended engaging a surveyor to make readings over a six month period at established points near the fence line. Id. There is no indica-

tion that Eazor followed his advice, although the cracks and subsidence continued in depth and extent prior to Weeks dredging in April 1974. Compare PX 49, drawing No. 2 with PX 48.

Also noteworthy was the large stratum of "soft silt & clay or peat" lying below the top fill of the property down to a depth of more than 20 feet at the bulkhead areas. These conditions existed at the time Raymond Concrete Pile Company made its borings in 1965 preliminary to the construction of Eazor's terminal. As noted in PX-49, Section A-A of Drawing No. 2, the peat stratum extended under the upper fill layer from the terminal area to the riprap bulkhead. Those drawings were prepared in July 1972 by Eazor's own engineers—almost two years before the Weeks dredging. They reflect that as the upper layer of fill pressed down on the soft peat, the surface asphalt cracked open and subsided, creating pressure against the landward face of the riprap bulkhead and causing it to slide forward on the descending slope of the creek bed, thereby gradually widening and deepening the subsidence behind the bulkhead. That process did not cease with the passing of time.

The subsidence conditions continued to worsen in 1973 and thereafter, as shown in photographs taken July 25, 1974, just prior to Eazor's lease of the terminal to United Parcel Service. DX E. Two of those photographs depict "yard alongside canal sinking" some nine months prior to Weeks dredging in April 1974. Id. Eazor, however, took no further action to ascertain the cause of the subsidence during United Parcel's lease, although Edward Kardell, Eazor's terminal manager, acknowledged inspecting the premises occasionally. According to his testimony, it was not until the spring of 1975 that he came upon the "unbelievable disaster", which he described as "[t]his whole area from the fuel pumps down to all the end of the property just completely fell down—just completely sunk about four or five feet." Tr. 186.

Informed of those asserted developments, Robert Eazor, then president and chief executive officer of Eazor, directed Kardell to take snapshots of the area extending along the riprap bulkhead side of the property. PX 10. Those photographs depict nothing more than a deepening, widening and extension of the same collapsing pavement shown in the 1973 photographs, DX E, *supra*, a year prior to the Weeks dredging. Bearing in mind that Eazor did nothing to correct the subsidence conditions as recommended in 1972 by its own consulting engineer, it should not have been surprising that further erosion and subsidence would occur under the weight of United Parcel's three years of truck traffic and the erosive effects of rain, snow and ice on the subsiding pavement in the bulkhead area.

### Discussion

After a searching review of the testimony, the exhibits, the proposed findings of fact and the parties' briefs, the Court concludes that Eazor's claim is not supported by a preponderance of credible evidence and is in fact untenable as a matter of law.

██ Eazor has proceeded here on the theory that ACE negligently permitted Weeks to dredge in the vicinity of Eazor's bulkhead beyond the depth limits specified in the government contract, namely 17 feet, and that such dredging removed the lateral support provided by the sloping bank upon which the bulkhead rested. In advancing that theory, Eazor is essentially endeavoring to invoke the rule of *res ipsa loquitur*. The *res ipsa* rule, however, requires "facts proved affirmatively showing a surrounding situation which in the ordinary course would not permit or produce injury, and also that something under defendant's control did inflict the injury complained of." *Savard v. Marine Contracting, Inc.*, 471 F.2d 536, 542 (2d Cir.1972), *cert. denied sub nom. Savard v. Perini Corp.*, 412 U.S. 943 (1973). Those requisites have not been met by Eazor, for it is beyond dispute that the subsidence of the bulkhead began years before the 1974 dredging due to the compaction of the underlying peat stratum. And wholly aside from the fact that the

dredging was performed by an independent contractor and not by ACE, Eazor has also failed to produce credible evidence that the dredging was in fact responsible for the subsidence complained of. There is no showing as to how the dredging was performed, nor any evidence that the dredging could have been accomplished in a manner different from the way in which Eazor assumes it was carried out. It is a "well-accepted principle in all jurisdictions that the mere fact that an accident or injury has occurred, with nothing more, does not constitute a prima facie case of negligence." *Calvert v. Katy Taxi, Inc.*, 413 F.2d 841, 844 (2d Cir.1969).

Finally, Eazor's emphasis on the reference in the government's contract specifications concerning "bulkheads which are in poor condition" cannot provide a basis for assessing liability against the government for improper dredging. That clause simply alerted a contractor (here Weeks) to take necessary precautions to prevent damage to such bulkheads, and reserved to ACE the right to specify the distance from the bulkheads at which dredging was to be limited. That provision imposed no obligation on the government to inspect bulkheads, but served simply to notify dredging contractors that dredging could be limited and their compensation reduced accordingly. Again, there is a total absence of evidence linking the government or Weeks to the conditions responsible for the subsidence of Eazor's bulkhead.

### The Applicable Law

The rules of law applicable to Eazor's claim are not affected by Private Law 96–66 which permitted the bringing of this action after the expiration of the two-year limitation period provided by the Suits in Admiralty Act ("SIAA"), 46 U.S.C. §§ 741–752. Although the SIAA effects a waiver of sovereign immunity for certain maritime claims against the United States, it does not contain an express exception for harm caused by the exercise of "discretionary functions," such as those involved in this case. However, there is appellate authority holding that such an exception should be implied. *See Gercey v. United States*, 540 F.2d 536, 539 (1st Cir.), *cert. denied*, 430 U.S. 954 (1976); *Canadian Transport Co. v. United States*, 663 F.2d 1081, 1085 (D.C. Cir.1980); *Bearce v. United States*, 614 F.2d 556, 559 (7th Cir.), *cert. denied*, 449 U.S. 837 (1980); *contra Lane v. United States*, 529 F.2d 175, 179 (4th Cir.1975); *De Bardeleben Marine Corp. v. United States*, 451 F.2d 140, 146, n. 15 (5th Cir. 1971) (dictum).

Consistent with prior decisions in this circuit, the activity of ACE in this case fell squarely within the concept of "discretionary function." Thus in *F. & M. Schaefer Brewing Co. v. United States*, 121 F.Supp. 322 (E.D.N.Y.1954), the Court dismissed an action brought under the Federal Tort Claims Act, which sought recovery from the government for the collapse of the plaintiff's bulkhead and dock bordering Wallabout Bay. Noting that dredging operations were conducted by a contractor, albeit under the supervision of the Navy Department, the Court held "that the dredging operations constituted (1) a discretionary function for which the Government has not consented to be sued …" and dismissed the action *in toto*. *See also Lipka v. United States*, 369 F.2d 288, 291 (2d Cir.1966), *cert. denied*, 387 U.S. 935 (1967) (supervision by United States Corps of Engineers of contractors' employees in construction of cofferdam does not render the government liable for death and injury to employees). Applying those precedents, this Court rules that Eazor is not entitled to hold the government liable for the alleged damage to its bulkhead.

In addition to the foregoing, another established rule bars Eazor from recovery of damages against the government. There is no question that the dredging complained of was performed by Weeks as an independent contractor. In bidding for the job, Weeks was simply required to comply with the specifications set forth in the contract. In performing the contract, Weeks was acting solely in its own interest. Al-

though Weeks was required to provide ACE with reports of the dredging operation, the contractor was in no sense acting as a federal employee or instrumentality. There was no evidence that ACE controlled or supervised the performance of the work. In such circumstances, as held in *United States v. Orleans*, 425 U.S. 807 (1976), the independent contractor exception found in the Federal Tort Claims Act bars Eazor's claim against the United States. *See also Bauer-Smith Dredging Co., Inc. v. United States*, 283 F.2d 877 (Ct. Claims 1960), *cert. denied*, 368 U.S. 819 (1961); *Lipka, supra*, 369 F.2d at 291–92.

Accordingly, the Clerk is directed to enter judgment dismissing the complaint.

SO ORDERED.